𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

Morris & Co., Inc., v. Alvis.

January 17, 1924.

1. APPEAL AND ERROR—*Successive Appeals—Law of the Case—Case at Bar.*—In the instant case, an action by a servant against his master for injuries sustained by falling into an open elevator shaft, upon the first hearing on appeal, it was held that two negroes picked up on the street and put to work in defendant's plant were fellow servants of the plaintiff, that the duty to instruct them as to placing the elevator so as to close the opening in the shaft was a nonassignable duty of the master, that "if they were not properly instructed then the defendant omitted a part of its nonassignable duties with reference to the method of doing the work, and that what the plaintiff assumed was the risk of the negligence of fellow servants who knew the rule and knew their own duties with respect thereto." This holding settled the principle involved for the purposes of the second trial.

2. MASTER AND SERVANT—*Instructions to Servants—Questions of Law and Fact—Case at Bar.*—In the instant case plaintiff was injured by falling into an open elevator shaft. There was evidence to the effect that the employees who left the shaft open had been instructed to leave the elevator flush with the floor when they had finished using it. Both the employees, however, testified that no such caution or warning was given them, that they had never been in the building before and knew nothing of the danger.

    *Held:* That whether such instruction or warning was given to the employees was a question for the jury, and there being abundant evidence to support a finding for the plaintiff, the trial court could not disturb it.

3. INSTRUCTIONS—*Instructions Read as a Whole—Evidence to Support.*—Instructions given are to be read as a whole, and in connection with the issues made by the pleadings so far as there is evidence tending to support such issues. There must, however, be evidence tending to support such issues.

4. INSTRUCTIONS—*Evidence to Support—Harmless Error.*—Instructions unsupported by any evidence in the cause are said to state abstract propositions of law, and should not be given, as they tend to mislead the jury; but if the court can see that the jury could not have been misled, they will be regarded as harmless.

5. MASTER AND SERVANT—*Instructions—Action Arising from Falling Into an Elevator Shaft—Case at Bar.*—In an action by a servant against his master for injuries occasioned by falling into an open elevator shaft, an instruction in defining the duty of the defendant in the selection of "person of ordinary and reasonable competence and reliability" for the work of handling the elevator, evidently con-- templated that the persons selected to do the work, in order to be competent, should have been informed of the danger to be appre-· hended and of the method of avoiding it; and that the failure to give· such information put such persons in the attitude of being incom-- petent to do the work.

*Held:* That whether this contemplation was justified or not, it was· not necessary to decide, as under the issues made by the pleadings· and the evidence tending to support them, the jury could not have been misled.

6. MASTER AND SERVANT—*Instructions—Action Arising Into an Elevator Shaft—Incidental Use of Elevator—Case at· Bar.*—In the instant case, an action by a servant against his master for injuries· arising from falling into an open elevator shaft, it was contended by· defendant that the employees who left the shaft open were not em-- ployed to use and operate the elevator, but to assist in taking stock, and that the use and operation of the elevator was merely incidental. In taking stock it was necessary to bring salt meat from one floor· to another, and these employees were employed to help in ascer- taining the quantity of salt meat. This involved not merely the· handling of the salt meat, but the use of the elevator to carry it from one floor to another.

*Held:* That the use of the elevator was by no means an incidental' operation, and that the employees were employed to use it, and, in· view of the danger to be encountered from the improper disposition· of the elevator, they should have been properly instructed on the subject.

7. MASTER AND SERVANT—*Instructions—Action Arising from Falling Into an Elevator Shaft—Proximate Cause—Case at Bar.*—In the instant case, an action against his master by a servant for injuries arising· from falling into an open elevator shaft, the unguarded open elevator· shaft was, under the circumstances of the case, the proximate cause· of plaintiff's injury, and an instruction which was clearly directed to· the notice given the employees who left the shaft open of the danger of such action, and their capacity to understand and appreciate such. warning, if given, and not to any other incompetency of such em-- ployees, was not erroneous for lack of evidence to support it.

8. MASTER AND SERVANT—*Instructions—Action Arising from Falling Into an Elevator Shaft—Case at Bar.*—In an action by a servant against his master for injuries occasioned by falling into an open elevator·

shaft, the court instructed that if the master, in the employment of the men to operate the elevator, exercised ordinary care to select "competent men," and exercised the same degree of care to instruct them in the manner of placing the elevator, and they neglected to do so, their negligence in that particular would be the negligence of a fellow servant, on account of which plaintiff could not recover.

*Held:* That the jury must have understood this instruction as saying that if the men were adequately instructed as to their duties in respect to placing the elevator and had neglected to so place it, the plaintiff could not recover, and the use of the words "competent men" could not have misled them.

9. MASTER AND SERVANT—*Fellow Servants—Instruction that Plaintiff is Fellow Servant of Another—Case at Bar.*—In the instant case it was not error for the trial court to refuse an instruction which told the jury, as a matter of law, that the plaintiff was a fellow servant of another. This it could only do where the evidence so plainly established that fact that reasonably fair-minded men could reach no other conclusion; and the evidence on the subject, in the instant case, was not of that character.

10. MASTER AND SERVANT—*Fellow Servants—Questions of Law and Fact.*—Usually what constitutes a fellow servant is a question of law for the court, but whether or not two or more persons come within the law's definition is a question of fact to be determined by the jury under proper instructions from the court.

11. INSTRUCTIONS—*Oral Remarks to Jury—Duty of Jury to Agree Upon Verdict—Amount of Verdict—Case at Bar.*—In the instant case the public statement by two of the jurors that the jury "had disagreed as to the amount" of their verdict could only mean in this case that they had agreed upon a verdict for the plaintiff. Such being the case, the judge of the trial court was entirely within his rights when he told the jury, as they had agreed on the "main question" in the case, "the other question is secondary and there ought not to be any irreconcilable differences on the question. I trust, therefore, you will be able to reach a verdict." The jurors had publicly stated, in effect, that they had agreed on a verdict for the plaintiff, and as there was no measure of damages in such case, it was plainly a case in which there "ought not to be any irreconcilable differences" as to the amount.

12. MASTER AND SERVANT—*Action by Servant for Injuries—Excessive Verdict—New Trial—Case at Bar.*—A verdict of $10,000.00 in an action by a servant against his master was not excessive where plaintiff suffered a fracture of a segment of his backbone, and was still wearing a brace four years after the injury, and his nervous system was in a very bad condition at the time of the trial, especially as on two former trials the jury had awarded verdicts respectively of $12,500.00 and $10,000.00.

13. New Trials—*Excessive Verdict—Personal Injury Cases.*—There is no measure of damages in personal injury cases, and the law is well settled that the verdict of the jury in such cases will not be set aside as excessive unless it is made to appear that the jury has been actu-- ated by prejudice, partiality, or corruption, or that they have been misled by some mistaken view of the merits of the case.

14. Master and Servant—*Action Arising from Falling Into an Elevator Shaft—Obvious Danger—Instructions by Another—Case at Bar.*—In the instant case, an action by a servant against his master for injuries arising from falling into an open elevator shaft, defendant contended that the verdict for plaintiff was contrary to the law and the evi-- dence, because the danger of leaving the shaft open was obvious, and in the exercise of ordinary prudence any one using the elevator, whether instructed or not, would understand that when it was not in use it should be so placed as to close the shaft. On a former appeal the court was of the opinion that if the employees who left the shaft open had not been properly instructed as to the danger of so doing, "then the defendant omitted a part of its nonassignable duties with reference to the method of doing the work," and in the present case the court adhered to that conclusion even if "the question was not then before the court."

15. Appeal and Error—*New Trial—When Verdict Will be Set Aside by Trial Court—Review of Judgment of Trial Court Sustaining a Verdict.*—A trial court has no power to set a verdict aside unless it was without any evidence to support it, or was plainly contrary to the evidence; in other words, in reviewing a judgment of the trial court sustaining a verdict, the case, with rare exceptions, is heard as on a demurrer to the evidence.

16. Master and Servant—*Action Arising from Falling Into an Elevator Shaft—Contributory Negligence of Plaintiff.*—In an action for injuries to a servant from falling into an open elevator shaft, a verdict for the plaintiff was a finding that he was not guilty of contributory negligence, and in view of plaintiff's testimony and testimony tend-- ing to support him, this finding that plaintiff was not guilty of con- tributory negligence and the judgment of the trial court sustaining the finding could not be disturbed on appeal.

Error to a judgment of the Circuit Court of the city of Lynchburg, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Harrison, Long & Williams,* for the plaintiff in error.

*Volney E. Howard* and *John L. Lee,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

·This was an action by Alvis against Morris and Company, Incorporated, to recover damages for a personal injury received by falling into an open elevator shaft ·on the premises of the defendant. This is the second time this case has been before this court. It is first reported as *Morris & Co.* v. *Alvis,* 130 Va. 434, 107 S. E. 664. The testimony as to the physical arrangement of the building, the absence of any door to the elevator, ·the method of supplying this deficiency, the inadequacy of the lighting system, the circumstances attending the accident and the like, was much the same on the second trial as on the first. The following statement is taken from the opinion of the court on the former hearing.in this court:

"Morris and Company is a corporation extensively engaged in packing and selling meats, and has a branch house in Lynchburg. Alvis had been working for the company about five months. His principal business was that of city salesman and collector, but it was further his duty at times and as occasion required to assist with various kinds of work in the house. He and other employees were occasionally there at night in the performance of some of their duties and in the regular line of their employment.

"The accident occurred on the night of October 26, 1917. On the afternoon of that day one Ross, a traveling auditor for the defendant, had come to Lynchburg to check up the business, and not having completed

his work during the afternoon, he and Alvis came back to the building that night. There is a contention on behalf of the defendant that Alvis was there voluntarily, and not in the line of his employment, and another contention that he was there temporarily in the capacity of manager, but we think the evidence is otherwise.

"The first floor of the building consists of three main compartments, a shipping room in front (reached by the main entrance to the building), an office room to the right of the shipping room, and a canned meat room in the rear. Between the shipping room and the canned meat room there is an elevator shaft enclosed on three sides, the fourth and open side facing the shipping room. To the rear of the office and to the right of the elevator is an entrance to a cellar stairway. To the left of the elevator is the entrance to the meat room. The situation of the main entrance, the office door, the open side of the elevator shaft, and the door to the meat room are relatively such that a man making a trip from outside of the building through the main entrance into the office, and thence to the meat room, would on coming in the main entrance walk diagonally to his right through the shipping room into the office, then, coming back out of the office, he would walk again diagonally to his right, passing the elevator door, and around the elevator shaft into the meat room.

"According to the testimony of the plaintiff, in some respects very much in conflict with the testimony of other witnesses, but accepted by the jury, the circumstances of the accident were substantially as follows:

"When Ross and Alvis went back to the office on the night in question, they entered the shipping room through the main entrance, and found their way through the shipping room into the office by means of the reflection of a light from that compartment, there being

a glass partition between the office and shipping room. The electric lamps or bulbs in the office were insufficient for their purposes, and Ross suggested that they must have more light.   Thereupon both of them started in search of other bulbs which they hoped to find in some other compartment.   They went first to the meat room following the course above indicated, the plaintiff feeling his way around the wall until he was sure that he had passed the elevator opening.   Failing to find the bulbs they wanted in the meat, they turned back, intending to go to the cellar where they thought they would find them.   To do this they had to pass the open elevator door again.   The plaintiff, who was immediately in front of Ross, did not on the return trip feel his way, but depended upon his estimate of the distance, and when he thought he had proceeded far enough to be beyond the opening in the elevator, he stepped into the shaft and fell to the floor of the elevator, which at the time was in the cellar.   It had been left in that position by two colored men whom Ross had 'picked up on the street' that afternoon to help him.   He didn't know 'who they were or anything about them;' and so far as the record discloses nobody connected with either the plaintiff or the defendant ever heard of them either before or after the accident.

"There had originally been a door to the elevator shaft on the shipping room floor, but this door had been broken off or displaced for a year or more, and was not in use at any time after Alvis came there to work. Instead of replacing the door the defendant adopted the expedient of using the elevator, when not in use for elevator purposes, to close the shaft by placing and leaving it so that the floor thereof was even with the floor of the shipping room, thus practically extending the floor of the shipping room into the elevator shaft, and thus obviating the danger resulting from the dis-

placed door. In other words, the rule of the company as a part of its plan for maintaining the first floor of its building in a safe condition, required that the elevator when not in use should be left so that the floor thereof would be flush with the office floor. The evidence is not entirely clear as to whose business it was to see that the elevator was left in this position when not in active use, but it was a freight elevator, operated from time to time by various employees, and the fair inference appears to be that this duty devolved upon any employee who had occasion to operate the conveyor.

"It is also shown that for some time prior to the accident the lighting system in the building had been in a defective condition. Some of the switches not working well, and also that the supply of electric bulbs was entirely insufficient to thoroughly light the building at night. There was not a great deal of night work to be done, and the custom had been to move the limited number of lights from place to place as occasion required

"The plaintiff, Alvis, was fully apprised of all the foregoing conditions. The absent door, the custom of keeping the elevator, when not in use, on the office floor as a substitute for a door, and the insufficiency of the lighting system were all conditions which had prevailed ever since he begun work with the company. He testifies about all of these facts, and his testimony shows that he was thoroughly familiar with them all, saying particularly with reference to the lights, as showing that he was often there at night, that 'there never were enough bulbs for all the place and we shifted them about from one place to another when we worked at night.' This statement was in reply to a question by his counsel as to how long that condition had prevailed; and he further testifies that if he ever made any complaint to the company about that condition, he does not remember it."

The acts of negligence relied on at the first trial were (a) permitting the elevator door to remain broken and displaced, (b) failing to furnish sufficient lights, and (c) failing to have the elevator in proper position at the time of the accident.   All of these grounds of negligence were decided adversely to the plaintiff upon the evidence then before the court, but the case reversed for error in the instructions, and for satisfactory reasons fully set forth in the opinion, judgment was not entered up for the defendant, and the case was remanded to the circuit court for a new trial.   In the course of the opinion it was said: "The two negro men picked up on the street, though employed only for a few hours, were doing the same sort of work which other employees were constantly doing with the elevator. They were fellow servants of the plaintiff, and if they were properly instructed as to the position in which they were to leave the elevator when they quit using it, their failure to properly place it brought about a danger the risk of which had been assumed by him.   If they were not properly instructed, then the defendant omitted a part of its nonassignable duties, with reference to the method of doing the work.   What the plaintiff assumed was the risk of the negligence of fellow servants who knew the rule and knew their own duties with respect to it.   There is no evidence to show that these two unknown temporary employees either were or were not given any instructions about the position in which they were to leave the elevator.   The general rule is that, in the absence of proof, a master is presumed to have discharged all of his nonassignable duties.   The doctrine of assumed risks is generally regarded as a harsh one, and is not to be extended. In doubtful cases, the question of is applicability is to be determined by the jury.   Whether the presumption

above mentioned can be carried far enough in this case to enable us to hold as a matter of law that the plaintiff assumed the risk of what these two employees did, without affirmative proof that they were instructed may be open to question; but if not, then the question was certainly one for the jury upon proper instructions."

When the case got back to the circuit court, the plaintiff amended his declaration by adding a count in which it charged that the "defendant was guilty of negligence, first, employing the said two *ignorant, inexperienced and incompetent* negroes and in putting them at the work of operating said elevator, which work required the qualifications of *ordinary knowledge, discretion* and prudence *in the proper placing of said elevator* when they left it, with a view to the safety of the plaintiff and other employees of the defendant; second, in *failing to inform and instruct* the said two co-employees of the plaintiff *regarding the aforesaid rule, habit and custom* respecting the *proper placing of said elevator when it was left by them,* after they were through with its operation and *of the danger of their failure to properly place it;* and, third, in failing to provide and furnish any *intelligent, proper* and *adequate supervision* over, or *direction* of the service then performed by said two employees, by some person with knowledge, information and capacity *appropriate to the reasonable requirements of the situation and occasion and the safety* of the plaintiff and other employees of the defendant."

To the declaration, as amended, the defendant pleaded not guilty and filed the following grounds of defense:

"1. The defendant was not negligent as alleged in either count of the declaration.

"2. The plaintiff assumed the risks of the conditions and methods of work in consequence of which the accident complained of is alleged to have occurred.

"3. The plaintiff was himself negligent, and his negligence contributed to cause the injuries complained of."

Upon these issues the parties went to trial, and there was a verdict and judgment for the plaintiff for $10,000.

[1] Upon the former hearing, we held that the two negroes that were picked up on the street and put to work in the plant were fellow servants of the plaintiff; that the duty to instruct them as to placing the elevator was a nonassignable duty of the master, that "if they were not properly instructed then the defendant omitted a part of its nonassignable duties with reference to the method of doing the work, and that what the plaintiff assumed was the risk of the negligence of fellow servants who knew the rule and knew their own duties with respect thereto." This holding settled the principle involved for the purposes of the second trial. *Norfolk & W. R. Co.* v. *Duke*, 107 Va. 764, 60 S. E. 96.

[2] On the second trial Ross testified that the two negroes were brought in at his request; that they were put to work by him, paid upon his order; that the danger of leaving the elevator on the lower floor was obvious, and that he cautioned them when they first came in to leave the elevator flush with the shipping room floor when they finished with it. Both negroes, however, testify that no such caution or warning was given; that they were never in the building before and knew nothing of the danger involved. It does not appear that they knew anything of the use of the building at night. Whether or not such instruction was given was plainly a question for the jury, and they found for the plaintiff. There being abundant evidence to support that finding, the trial court could not disturb it. But the plaintiff in error claims that Ross also was a fellow servant of Alvis, and that he negligently failed to replace the elevator, and that Alvis assumed this risk. This question will be dealt with later.

There are two assignments of error. The first is: "The court erred in the instructions given at the request of the plaintiff, and in the instructions given orally to the jury, and in not giving the third instruction requested by the defendant, and in modifying said third instruction and giving it as modified."

Instructions 1 and 2 are as follows:

1. "The court instructs the jury that if they believe from the evidence that the defendant company had caused or permitted the door to its elevator shaft to become and remain displaced and removed, and that such displacement and removal of said door caused said elevator to be a source of danger to defendant's employees while engaged in their work in said building in the night time, if the shaft of said elevator was permitted to remain open; and if they further believe from the evidence that the defendant adopted the method and practice which required its several employees using said elevator to place it, when not in actual use, or after using it, so that the floor thereof should rest on a level with the floor of said shipping room and thus close the said shaft and remedy that source of danger; that it was the duty of said defendant, and of its agents charged with the duty of employing persons for the business of operating said elevator, to exercise ordinary care to select and employ persons of ordinary and reasonable competence and reliability for that work, with due regard to the character of work to be performed, and a failure to exercise said degree of care in the selection of employees for that purpose would be negligence."

2. "The court instructs the jury that if they believe from the evidence that the defendant company had caused or permitted the door of its elevator shaft to become and remain displaced and removed, and that such removal and displacement of said door caused said ele-

vator shaft to be a source of danger to defendant com-
pany's employees while engaged in their work in said
building in the night time, if the shaft of the elevator
was permitted to remain open; and if they further be-
lieve from the evidence that the defendant adopted the
method and practice which required its several em-
ployees, when using said elevator to place it, when not
in actual use, or after using it, so that the floor thereof
should rest on a level with the floor of said shipping
room and thus close the said shaft and remedy that
source of danger; and if they further believe from the
evidence that the two negroes employed to use and
operate said elevator on the evening of October 26,
1917, were strangers to the business and ignorant of said
requirement, method and practice of placing said ele-
vator as aforesaid, when they should be through with
its operation, then it was the duty of the defendant, and
of their agents and servants employing them, to inform
them of said requirement and to use reasonable care to
adequately instruct them respecting the same, and if
they failed to do so it was negligence imputable to the
defendant.''

[3, 4] The objection made to instruction No. 1 is that
there was no evidence to support it, and to No. 2 that
the negligent failure of the defendant to instruct these
men had no causal connection with the accident.    In-
structions given are to be read as a whole, and in con-
nection with the issues made by the pleadings so far as
there is evidence tending to support such issues.    There
must, however, be evidence tending to support such is-
sues.    Instructions unsupported by any evidence in the
cause are said to state abstract propositions of law, and
should not be given, as they tend to mislead the jury;
but if the court can see that the jury could not have been
misled they will be regarded as harmless.    *Southern Ry.*

6

*Co.* v. *Foster*, 111 Va. 763, 69 S. E. 972; *Smyth Bros.* v. *Beresford*, 128 Va. 137, 104 S. E. 371; *Southern Ry. Co.* v. *Oliver*, 102 Va. 710, 47 S. E. 862; *Richmond Granite Co.* v. *Bailey*, 92 Va. 554, 559, 24 S. E. 232.

[5] The sole issue presented at the second trial was that made by the amended declaration. The gravamen of that charge is that the defendant employed two inexperienced negro men to do the work on the premises which involved the use of the elevator; that they were ignorant and uninformed about the condition of the premises and of the necessity of leaving the elevator flush with the floor of the shipping room, and of the custom, rule and habit of the regular employees to so leave said elevator, and of the necessity therefor, and that the defendant failed to instruct and inform said employees to leave said elevator floor flush with the floor of the shipping room, and the necessity therefor. Instruction No. 1, in defining the duty of the defendant in the election of "persons of ordinary and reasonable competence and reliability for that work," evidently contemplated that the persons selected to do the work, in order to be competent, should have been informed of the danger to be apprehended and of the method of avoiding it; and that a failure to give such information put such persons in the attitude of being incompetent to do the work assigned. Whether this contemplation was justified or not, we need not decide, as it is plain that the jury could not have been misled by the instruction.

[6] Instruction No. 2 related specifically to the notice required to be given to the two negro men and declared that a failure to give such notice was negligence imputable to the defendant. It would probably be sufficient to say that the language of the instruction and the causal connection of the failure to instruct with the accident are fully indicated in the opinion rendered on the

first hearing of the case, but, in addition to that, the criticism of the instruction is not warranted by the evidence.   It is said: "The two negroes were not employed to use and operate the elevator, but to assist the auditor in taking stock of the dry salt meat, in doing which they took the meat up from the cellar on the elevator to the shipping room, to be weighed, and then took it back again on the elevator to the cellar.   The use or operation of the elevator was merely incidental to the work for which they were employed."   The use of the elevator was by no means an incidental operation.   It was a part of the work the negroes were employed to perform.   Ross was a traveling auditor whose business it was to check up the books of the branch office and ascertain its status with reference to the home office. This involved taking an inventory of the stock on hand. Part of this stock consisted of bulk salt meat stored in the cellar which had to be carried on the elevator to the second, or shipping room floor, to be there weighed and then brought back on the elevator and repacked.   The elevator was operated by hand and could only be operated from the shipping room floor, and the rope by which it was operated was dirty.   Under these circumstances, Ross employed the two negro men, not for the purpose of checking books, settling cash, or counting canned goods, but for the purpose of enabling him to ascertain the quantity of salt meat on hand.   This involved not merely the handling of the salt meat, but the use of the elevator to carry it to and from the scales on the shipping room floor.   It was for this purpose they were employed, and, in view of the danger to be encountered from the improper disposition of the elevator, they should have been properly instructed on the subject.   We find no error in instruction 2.

[7] Instruction 3 was as follows:

"The court instructs the jury that if they believe from the evidence that the defendant, or its agents in charge, who were intrusted with the authority to employ the two negroes mentioned, failed to use reasonable care to adequately inform and instruct the said two negroes of their duty to place said elevator in its proper position after they were through with its use in the work in which they were engaged; or that they were incompetent for the performance of that trust after receiving such information and instruction as was actually given them, and that the defendant or its said agents knew, or by the exercise of ordinary care should have known, that they were incompetent for the performance of that duty, notwithstanding the instructions actually given, then the plaintiff did not assume the risk of their failure or negligence in the performance of that duty, if he was ignorant of their employment."

This instruction is criticised as follows:

"The objections to the two branches of this instruction are substantially the same as the objections to the first two instructions. The failure to instruct these men in respect to the use of the elevator, if there was such failure, was not the proximate cause of the accident; and there was no evidence whatever to show that the men were not competent to do the work for which they were employed. Their work appears, on the contrary, to have been entirely satisfactory.

"As there was no evidence to support this instruction, it should not have been given."

It is not clear what is meant by saying that the failure to instruct was not the proximate cause of the accident, nor have counsel enlightened us on the subject. The statement is made without elaboration, discussion, or citation of authority, and apparently is not relied on. The subject of proximate cause is one of the most diffi-

cult in its application known to the law, and we have no
disposition to enter the field of discussion upon so casual
an invitation, unaided by the counsel who extend the
invitation, but offer no reason or authority in support
of their statement.

In the instant case, we are of opinion that the un-
guarded, open elevator shaft was, under the circum-
stances of the case, the proximate cause of the plaintiff's
injury.

The instruction was clearly directed to notice to the
two negroes and their capacity to understand and ap-
preciate the instructions, if given, and did not refer to
any other incompetency.

[8] Instruction 6 was as follows:

"The court instructs the jury that if they believe from
the evidence that the auditor, N. Ross, in the employ-
ment of the two men to operate the elevator, exercised
ordinary care to select competent men for the perform-
ance of the duties entrusted to them, and exercised the
same degree of care to instruct them in a manner ade-
quate for the performance of the duties entrusted to
them in respect to the placing of the elevator, and they
neglected to do so, then their negligence in that particu-
lar would be the negligence of a fellow servant, on ac-
count of which the plaintiff could not recover."

The jury could not have understood this instruction
otherwise than as saying that if the two men were ade-
quately instructed as to their duties in respect to plac-
ing the elevator and had neglected to so place it, the
plaintiff could not recover.   The use of the term "com-
petent men" could not have misled them.

[9, 10] Instruction 3, offered by Morris & Company,
consisted of two parts.   The first part was sufficiently
covered by instruction 6 above, and need not be further
noticed.   The second part was as follows:

"And the court further instructs the jury that the said auditor was also a fellow servant of the plaintiff, and if they believe from the evidence that he understood that the proper place for the elevator, when not in use, was such that its floor would be flush with the shipping floor, and that by reason of his negligence, the elevator was not in this position at the time of the accident, the plaintiff cannot recover on account of such negligence on his part."

The trial court committed no error in refusing this part of the instruction. It tells the jury, as a matter of law, that Ross was the fellow servant of Alvis. This it could only do where the evidence so plainly established that fact that reasonably fair-minded men could reach no other conclusion; and we are of opinion that the evidence on that subject is not of that character. Usually, what constitutes a fellow servant is a question of law for the court, but whether or not two or more persons come within the law's definition is a question of fact to be determined by the jury under proper instructions from the court. It is not clear from the testimony that Ross took any part in the operation of the elevator or in superintending its operation. It is not distinctly stated that he did, though there are expressions in the testimony of the two negroes who testified for the plaintiff from which that inference might be drawn. For instance, we find this in the testimony of Norman English:

"Q. What were you doing?

"A. Weighing up some salt meat.

"Q. Who was helping you?

"A. Warren White and another fellow, a white man.

"Q. When you went down there who superintended your work?

"A. That white fellow was with us.

"Q. Was he with you pretty much all the time you handled the salt meat?

"A. Yes, sir."

These answers seem to refer to the weighing of the salt meat only, and not to any use of the elevator. It will be observed that he does not say that the "white fellow" superintended the use of the elevator, but simply that he was. "with us," and the witness elsewhere distinctly states that no instructions were given him by Ross as to how to leave the elevator. In the testimony of the other negro, Warren White, we find the following:

· "Q. After you went down there who took charge of you and who were you working for down there?

"A. I don't know who the man was.

"Q. Was he a white man?

"A. Yes, sir."

Coming from the ordinary negro witness of the day laborer class this was not satisfactory evidence that Ross exercised any authority about running the elevator. His answers probably had reference to who he was working for in weighing the meat. This seems especially so in view of the fact that he denies that Ross gave him any instructions about where to leave the elevator. On the other hand, Ross was an intelligent white man, introduced by the defendant, whose testimony shows that his first connection with these negroes was in the roll of vice-principal in employing them and instructing them where to leave the elevator when they finished their work. Whether he thereafter assumed the roll of fellow servant could have been best shown by examining him as to his relation to the negroes, and as to the acts performed by him in relation to the use of the elevator, but no such examination was conducted and no effort was made in his examination to show any conduct on his part that would place him in the category of

a fellow servant of the two negroes.   In answer to the question, who lowered the elevator to the basement when they began work, he says, "the men did that," and he also states that he did not ride up and down on the elevator but always used the steps.   He claims to have instructed the negroes when they began work about where to leave the elevator when they quit, but admits that he said nothing to them on the subject when they finished, although they were all in the cellar together. When asked on cross-examination why he did not himself see that the shaft was not left open, he replied, "I had other things to do besides that.   I had a lot of work to do."   Ross and the negroes were not doing the same work.   The negroes were loading the meat on trucks, taking the trucks up on the elevator and bringing them back the same way.   He was taking an inventory, simply getting the weights of the meat and putting down the figures.   This did not involve any supervision of the use of the elevator.   They were doing the manual labor, he the accounting.   He nowhere states that he operated the elevator himself, or that he superintended the operation by the negroes.   He was a mere traveling auditor for the defendant, whose home office was in Chicago, and he was bent on his work of accounting.   It seems manifest that he did not consider himself responsible for the placing of the elevator further than to discharge the nonassignable duty of his master of instructing the negroes where to place the elevator when they quit work.   Upon these facts it cannot be said as a matter of law that Ross was a fellow servant of Alvis, and the trial court committed no error in refusing to so instruct.   It was a question for the jury under proper instructions from the court.

The record shows the following, in reference to an oral statement of the trial judge to the jury:

"The jury having reported on December 16th that they could not agree, two of the jurors stating, in the presence of the whole jury, that they disagreed as to the amount, they were adjourned until the following morning, December 17th, when the court, before they retired to consider further of their verdict, addressed them orally, as follows:

" 'Gentlemen of the jury, I understand you have reached a conclusion on the main question in the case, and the other question is secondary, and there ought not to be any irreconcilable differences on that question. I trust, therefore, you will be able to reach a verdict. Give the jury the papers and let them retire.'

"The defendant excepted to this statement, and thereupon, at the request of the plaintiff, the jury which had retired were recalled, and the court addressed them further, orally, as follows:

" 'Gentlemen of the jury, as I told you on yesterday, in reading the instructions, the function of the judge and the jury are entirely distinct and separate. The court ought not and the court does not and would not in any case say anything that would indicate to you its views on the merits of the proposition, or what he thinks. The duty of the court is to say what evidence is competent and to explain to you what the law in the case is. The remarks that I made a little while ago were not intended to intimate what the verdict ought to be. I simply want you to understand that. If I said anything that is prejudicial to any party I recall it. What I said was that there should be an end to litigations. I told you yesterday, in the interest of both the plaintiff and the defendant, there should be an end to this litigation and you should reach a verdict if you can. That is all the court meant by its remark this morning. If you can reconcile your differences and honestly and conscien-

tiously arrive at a satisfactory settlement of the case it is desirable that you should do so. You can retire to your room. Give the jury the paper'."

It is earnestly insisted that the jury must inevitably have understood that the court approved their finding on the "main question" and was of opinion that a verdict should be rendered for the plaintiff, and if so, the court would approve it.

[11] The public statement by two of the jurors that the jury "had disagreed as to the amount" of their verdict could only mean in this case that they had agreed upon a verdict for the plaintiff. Such being the case, the judge of the trial court was entirely within his rights when he told the jury, as they had agreed on the "main question" in the case, "the other question is secondary and there ought not to be any irreconcilable differences on the question. I trust, therefore, you will be able to reach a verdict." The jurors had publicly stated, in effect, that they had agreed on a verdict for the plaintiff, and as there was no measure of damages in such case, it was plainly a case in which there "ought not to be any irreconcilable differences" as to the amount. *Smith* v. *Stanley*, 114 Va. 117, 75 S. E. 742.

[12, 13] The next assignment of error is the refusal of the trial court to set aside the verdict because it is excessive.

The plaintiff sustained very severe and substantial physical injuries. He suffered a fracture of a segment of his backbone, and was still wearing a brace four years after the injury. His nervous system was in very bad condition at the time of the last trial and he showed considerable nervousness on cross-examination at that trial. The jury at the first trial gave the plaintiff a verdict for $12,500.00, and at the second trial $10,000.00. We need not go into a detailed examination of the medical

testimony on which these verdicts were founded, as there is no measure of damages in such cases, and the law is well settled in this State that the verdict of the jury in such cases will not be set aside as excessive unless it is made to appear that the jury has been actuated by prejudice, partiality or corruption, or that they have been misled by some mistaken view of the merits of the case, and such does not appear in this case. *Southern Ry. Co.* v. *Smith*, 107 Va. 553, 59 S. E. 372; *E. I. Dupont Co.* v. *Taylor*, 124 Va. 750, 98 S. E. 866, and cases cited.

[14] It is next assigned as error that the verdict was contrary to the law and the evidence. It is said that the danger was open and obvious, and that "in the exercise of ordinary prudence any one using the elevator, whether instructed or not, would understand that when it was not in use it should be so placed as to close the shaft on the shipping room floor." We held on the former hearing that if the two men were not properly instructed "then the defendant omitted a part of its nonassignable duties with reference to the method of doing the work," and in the reply brief it is admitted that "so far as this appeal is concerned  *  *  they were not instructed." The necessity for the instruction and the result of a failure to instruct were recognized in the opinion delivered on the former appeal, and we adhere to that conclusion even if "the question was not then before the court."

[15, 16] It is insisted that the verdict of the jury should be set aside because the contributory negligence of the plaintiff is so conclusively established that reasonable men could not fairly differ in respect thereto. The trial court had no power to set the verdict aside unless it was without any evidence to support it, or was plainly contrary to the evidence; in other words, in reviewing a judgment of the trial court sustaining a ver-

dict, the case, with rare exceptions, is heard in this court as on a demurrer to the evidence.   *Norfolk & W. Ry. Co. v. T. W. Thayer Co.*, 137 Va. 294, 119 S. E. 107.

**PLAN OF FIRST FLOOR OF MORRIS CO.
NINTH ST. LYNCHBURG, VA. DEC. 10, 1921
SCALE 1 IN = 8 FT.**

The verdict for the plaintiff was a finding that he was not guilty of contributory negligence.   Was there any evidence to warrant the finding?   The annexed plat, which is substantially correct, will serve to elucidate the

testimony of the plaintiff.  He went to look for light bulbs; Ross having complained of insufficient lights in the office where he was working.  He states that he went from the office into the shipping room to the cluster of lights, suspended from the ceiling, and finding none, he went straight across to the wall, and feeling his way along by the wall passed between the wall and the elevator along a narrow passage to the door leading in the canned meat room at "A," and, finding none available, he started back, intending to go into the door at "E," leading down to the cellar where Ross said he knew there were bulbs he had been using during the day.  After leaving the canned meat room at "A" on his return trip he advanced along and passed the narrow passageway between the wall and the elevator, and continued in that direction until he had reached a point about opposite the office door, say at "B," or as he puts it, "I came out of that passway and went far enough, as I thought, to pass the elevator and far enough to carry me to the room to the right of the elevator."  He then turned at right angles to the left, going in the direction of the office door, until he thought he had gone far enough to pass the elevator, and far enough to carry him to the door to the cellar, and then turned again at right angles to his left, to go into the door at "E," leading to the cellar, but walked into the open elevator shaft at "F."  The route taken by him is nearly indicated on the map by the dotted line A, B, C, F, and the route intended, nearly by A, B, D, E; the lines C-E and D-E being to the edge of the respective doors.  It will be observed that if the elevator door had been on a line with the cellar door, the distance between the two doors would have been less than four feet.  In other words, when the plaintiff left the wall of the building near "B" and started in the direction of the office door, along the

line B-C, intending to go to the cellar door, he should have continued to "D," but in the darkness he miscalculated the distance he should have gone, by less than two steps. He knew nothing of the negroes working in the building that day, and had no cause to suspect that the elevator was not in place as usual, or to anticipate danger from the elevator if he missed his calculations and walked into it. According to the testimony of the plaintiff, there was no light in the office except a twenty candle power electric light in the rear of the office, not opposite the door, but sixteen or seventeen feet from the door behind the partition wall, which gave a very little reflected light through the office door. No light could come through the sides of the office which were of glass because of goods piled up above the height of the glass partition. The plaintiff testified about the light in the shipping room, in part, as follows:

"Q. What was the condition of the light in that shipping room?

"A. There wasn't any light in there.

"Q. What light was in the office?

"A. There was only one light in the office when we went in.

"Q. To what extent did that light in the office give light in the shipping room at that time?

"A. There was some lard and pinto beans piled up against the partition that partitions the office from the shipping room.

"Q. That was glass; or a part of it was glass?

"A. Yes, sir; and those things were packed up there and it would give no light, or practically no light in the shipping room.

"Q. So that the shipping room was practically dark?

"A. It was.

"Q. Do you know why you went into this elevator; what was the condition of the light or darkness?

"A. There wasn't any light in that room.

"Q. Well, was it dark?

"A. It was.

"Q. Was it too dark for you to see that the door was open?

"A. Yes, sir.

"Q. It was too dark for you to see that the elevator wasn't in place?

"A. Yes, sir."

On cross-examination he testified in part as follows:

"Q. There was light enough in the office, at the end of the office, for you to see the door opening?

"A. That light over there couldn't show back over yonder at the door.

"Q. You could see some light in the shipping room at the door?

"A. Not in the shipping room, but in the office. It would show a light over the wall but it would not come from that end and show back out here where we were or couldn't show out in the shipping room.

"Q. Do you mean to say, Mr. Alvis, that it was pitch dark in there?

"A. It was so dark I couldn't see where I was going.

"Q. And you couldn't see the wall?

"A. No, sir."

Ross, a witness for the defendant, testified on cross-examination that there was no light in the shipping room, "except the reflection from the office," but that "it wasn't pitch dark." More in detail, he testified as follows:

"Q. Standing, say ten feet away from the elevator shaft that night, under the conditions that existed there, could a man plainly see the elevator shaft was open?"

"A. I don't know that he could see the elevator shaft was open, but he could see at least the elevator there.

"Q. He could see the opening into the elevator?

"A. Yes, sir.

"Q. Did you see that?

"A. I don't mean the opening in the floor.

"Q. I don't mean that either, but he could see the opening that led into the shaft?

"A. Yes, sir."

In view of this testimony, and of other testimony tending to support that of the plaintiff, the finding of the jury that the plaintiff was not guilty of contributory negligence, and the judgment of the trial court sustaining that finding, cannot be disturbed.

Upon the whole case, we are of opinion that the judgment of the trial court should be affirmed.

*Affirmed.*