# Richmond.

## J. Maury Dove Company, Inc., v. New River Coal Company, and Others.

### May 24, 1928.

1. SALES—*Action by Purchaser for Breach of Contract to Furnish Coal—Impairment of Purchaser's Credit—Unauthorized Assignment of Contract—Questions for the Jury—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused. It was contended in oral argument that a new agreement between the purchaser and its assignees emphasized the fact of the incapacity of the purchaser to continue its execution of the coal contract.

   *Held:* That all inferences in that connection were for the jury to consider, together with the other evidence in the case.

2 . SALES—*Action by Purchaser for Breach of Contract to Furnish Coal—Impairment of Purchaser's Credit—Unauthorized Assignment of Contract—Questions for the Jury—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused.

   *Held:* That upon consideration of all the evidence in the record the trial court did not err in submitting the issues arising upon the evidence to the jury, nor in overruling a motion to set aside the verdict in favor of defendant.

3. SALES—*Action by Purchaser for Breach of Contract to Furnish Coal—Impairment of Purchaser's Credit—Unauthorized Assignment of Contract—*

*Questions for the Jury—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused. It was urged in oral argument on appeal that an agreement for the sale of plaintiff's business to another corporation contemplated the practical extinguishment of its corporate existence at once, except for purposes of liquidation, and provided for an immediate cessation by it of all business transactions; that its officers acquiesced in this view, and did not undertake to act for plaintiff company until after a modified agreement was entered into.

*Held:* That such argument was for the jury, and that the case was clearly a case in which the jury should determine whether defendant had repudiated the coal contract and had just cause for so doing.

·4. SALES—*Action by Purchaser for Breach of Contract to Furnish Coal—Imparmient of Purchaser's Credit—Unauthorized Assignment of Contract—Evidence—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to· cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused. On the trial evidence was admitted as to an arrangement by plaintiff with its creditors and other matters relative to the financial and credit situation of plaintiff. These were circumstances known to both parties at the time the coal contract was entered into. They threw light upon the meaning and intention of the parties in the contractual reference to the impairment of the buyer's credit.

*Held:* That the evidence was relevant and admissible.

·5. WITNESSES—*Cross-Examination—Question Provocative of Discussion between Counsel and Witness as to the Meaning and Legal Effect of Language of Contract.*—In the action for the breach of a contract for the sale of coal by buyer against seller, the refusal of the court to permit a witness on cross-examination to answer a question which would evidently have produced a discussion between counsel and the witness as to the meaning and legal effect of the language in question, was not error.

6. APPEAL AND ERROR—*Harmless Error—Failing to Strike Out Answers of Witness—Case at Bar.*—In the instant case the ruling of the trial court in failing to strike out answers by a witness was assigned sa

error. Another witness had already testified to the same thing, and in any event the ruling could scarcely have been prejudicial to the plaintiff in error.

*Held:* Harmless error.

7. EVIDENCE—*Argumentative Letters between Counsel.*—In the instant case the trial court did not err in refusing to admit in evidence certain letters between counsel for the parties. These letters were written with the intention of arguing the correctness of one or more of the positions taken by the respective parties and were properly excluded.

8. INSTRUCTIONS—*Request to Instruct Jury to Disregard all Evidence on a Particular Point—Testimony Upon the Point Considered as Upon a Demurrer to the Evidence.*—In considering a request to the trial court to instruct the jury to disregard all evidence pertaining to a particular point in issue, or a motion to set aside the verdict on such ground, the testimony bearing upon the point in question is to be considered as upon a demurrer to the evidence.

9. SALES—*Instructions—Request to Instruct Jury to Disregard all Evidence on Financial Condition or Credit of Plaintiff—Case at Bar.*—The instant case was an action by buyer against seller for breach of a contract of sale. The contract provided that the seller might cancel the contract if the credit of buyer became impaired. Plaintiff requested the court to instruct the jury to disregard all evidence pertaining to the financial condition or credit of the plaintiff, which the court refused to do. The credit of the plaintiff, as a subject involved, lay upon the very surface of the transactions and conversations between the parties during a certain period, and much evidence was introduced as to such transactions and conversations. The plaintiff subsequently sought continued credit for its successor, a new company, and not for the contracting party.

*Held:* That it was for the jury to determine whether or not the contract was and should be considered as cancelled and abandoned.

10. SALES—*Cancellation of Contract by Impairment of Purchaser's Credit—Formal Notice of Cancellation—Case at Bar.*—In an action for damages for breach of contract of sale by seller, defendant contended that the contract had been cancelled by the impairment of the buyer's credit and by the unauthorized assignment of his contract by buyer.

*Held:* That no formal notice of cancellation was required, as under the peculiar circumstances of the case the initiation of all the transactions was caused by plaintiff, and knowledge may be equivalent to notice.

11. SALES—*Cancellation—Impairment of Credit of Buyer—Right to Cancel a Continuing Right.*—The right to take advantage of a stipulation concerning impairment of credit is not similar to that arising upon a breach by the other party of an affirmative condition in a contract.

of sale. It is a continuing right or contractual privilege inhering at all times in the dealings of the parties. In connection with such a stipulation, there is no breach of a specific term in the contract, which the other party overlooked in a way to mislead the party in default.

12. SALES—*Cancellation—Impairment of Credit of Buyer—Waiver of Right to Cancel—Case at Bar.*—The instant case was an action by buyer for breach of a contract for sale of coal. The contract provided that the seller might cancel it if the credit of the buyer became impaired.

   *Held:* That no question of waiver of seller's right to cancel, where buyer's credit became impaired, could arise unless the seller had continued to furnish coal after the buyer had sold out to another company and attempted to assign the contract to it.

13. SALES—*Impairment of Buyer's Credit—Unauthorized Assignment of Contract of Sale—Election between Defenses—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused. The question of impairment of credit, and assignment or requirement by the original contracting buyer that the seller should accept a substituted buyer, were so interwoven in the case that the seller could rely upon both and was not put to an election.

14. SALES—*Instructions—Impairment of Credit of Buyer—Unauthorized Assignment of Contract—Measure of Damages—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused. The court instructed the jury that if the contract was not assigned by the plaintiff and the purchaser continued or did continue its corporate existence for the purpose of carrying out the contract, and the contract was not cancelled in accordance with its terms, they should find for the plaintiff and assess its damages at the difference between the contract price and the price at the time when the respective deliveries should have been made under the contract.

   *Held:* That the instruction plainly stated the general right of recovery.

15. Sales—*Instructions—Impairment of Credit of Buyer—Unauthorized Assignment of Contract—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver coal according to the contract. The defense of defendant was that the purchaser's credit had become impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused. The court instructed the jury, in effect, that if they believed that defendant undertook to cancel the contract for the purpose of obtaining an increased price, they must find for the plaintiff. But if defendant had reason to believe that the credit of the plaintiff was impaired and thereupon cancelled the contract, they shoud find for defendant, and that if they found from the evidence that the contract was assigned by the plaintiff, they should find for the defendant.

*Held:* That by these instructions the court gave the correct law to the jury.

16. Sales—*Instructions—Assignment of Contract by Buyer—Case at Bar.*—The instant case was an action for damages by a purchaser of coal against the seller for breach of the contract and failure to deliver the coal according to the contract. The defense of defendant was that the purchaser's credit became impaired, thus entitling seller to cancel the contract, and that the purchaser had undertaken to assign the contract to a third party, with a view to final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused   The court instructed the jury that a party to a contract may assign all his beneficial rights except where a personal relation is involved, but he may not assign his liability under the contract; that an assignment of a contract for the sale of personal property need not be a formal document and need not be in writing; that the contract in the instant case was such a contract as could be properly and legally assigned if there was a meeting of minds between the assignor and assignee. In effect the court told the jury that the coal contract in the instant case could be assigned, if properly and legally done, and correctly defined what were the proper and legal elements of an assignment in the case before them.

*Held:* No error.

17. Assignments—*Contracts—What Contracts Assignable.*—It is settled law that as a general rule the obligation arising under a contract may be assigned to a third party. The assignment or transfer may be made to appear by oral statements of the parties, or by their acts and conduct. When the contract contains mutual obligations and liabilities, or involves a relation of personal confidence, it cannot be assigned by one party without the consent of the other.

18.  ASSIGNMENTS—*Contract for Sale of Coal—Case at Bar.*—The contract in
     the instant case was an executory contract for the sale of coal re-
     quiring performance on the part of the seller by deliveries made
     from time to time, with a right during the execution of the contract
     to cease performance if there was an impairment of this particular
     buyer's credit, and with other mutual stipulations.

     *Held:* That the contract in the instant case was not transferable with-
     out the assent of the coal company, the seller. The duty of ac-
     cepting the purchaser's assignee or a new corporation as the buyer
     and of investigating its credit could not be thrust upon the seller.

19.  ASSIGNMENTS—*Contract for Sale of Coal—Instant Demand on Seller—*
     *Questions for Jury—Case at Bar.*—In the instant case, an action for
     breach of contract by the seller of coal, the purchaser assigned its
     interest in the contract to a new corporation. An instant demand
     by the new corporation, as a substituted party, for continued per-
     formance of the contract with it was made on the seller.

     *Held:* That the effect of this demand and of the evidence generally
     was properly left to the jury.

20.  BILL OF EXCEPTIONS—*Reference to "the Following as the Evidence"—*
     *Sufficiency—Case at Bar.*—The proceedings and evidence in the
     instant case, appearing in the printed record from page 89 to page
     303, were manifestly taken from the stenographer's transcript. It
     was not in any way identified nor authenticated by the trial judge.
     The bill of exceptions merely referred to "the following as the evi-
     dence," but there was nothing to indicate what was the evidence.
     Such a reference did not comply with the requirement held requisite
     in former decisions of the Supreme Court of Appeals.

Error to a judgment of the Corporation Court of the
city of Alexandria, in a proceeding in foreign attach-
ment. Judgment for defendants. Plaintiff assigns
error.

                                        *Affirmed.*

### Statement of the Case.

At the conclusion of the evidence, the following are
the instructions given to the jury by the trial court,
which are numbered, in the manner noted, for con-
venient consideration by the court:

"1. The court instructs the jury that although the
burden of proof is on the plaintiff that they are the
judges of the evidence, of the credibility of the witnesses

and of the weight to be given to the testimony of each witness.

"2. The court instructs the jury that if they believe from the evidence that the contract of July 1, 1926, between the plaintiff and the defendant, the New River Coal Company, was not assigned by the plaintiff but that the plaintiff subsequently, on or about November 17, 1926, agreed to continue and did continue its corporate existence for the purpose of carrying out said contract, and that if they further believe from the evidence that said contract was never canceled, in accordance with its terms and provision, by the said New River Coal Company, and further that the plaintiff ordered from the said defendant the coal as set out in the petition in this cause and tendered New York drafts in payment of the same in the amounts called for in said contract, that then they should find for the plaintiff and assess its damages at the difference between the contract price of $2.00 per ton during October and $2.70 per ton from November 1st to November 17, f. o. b. mines, and the wholesale price f. o. b. mines at the time when the respective deliveries should have been made under the contract; but no recovery can be had on shipments due after November 17th, except nominal damages.

"3. The court instructs the jury that if they shall believe from the evidence that in the month of September, 1926, the market price of coal had advanced so that the defendant, by canceling its contract with the plaintiff, could obtain a higher price therefor than by performing the said contract, and that the defendant undertook to cancel said contract for the purpose of obtaining such increased price and not *bona fide* and in good faith for any reason which it might have had to cancel the same under the terms thereof, if in fact

it had any such right, then their verdict must be for the plaintiff.

"4. In connection with instruction C-2, which I will read you later, the court further instructs the jury that if they find from the evidence that the plaintiff, the American Ice Company, and the new J. Maury Dove Company did not intend an assignment of the contract in suit to be made until a formal instrument of assignment should be executed and delivered, a presumption exists that no assignment was made until such formal instrument was executed and delivered.

"5. The court instructs the jury that, as a general rule, a party to a contract may assign all his beneficial rights, except where a personal relation is involved, or where it appears from the contract that it was not the intention of the parties that such rights should be assigned. But the court further instructs the jury that a party may not assign his liability under the contract, because anyone who is bound to any performance whatever, or who owes money, cannot, by any act of his own or by any act in agreement with any other person than his creditor or the one to whom his performance is due, cast off his own liability and substitute another's liability.

"If the jury believe from the evidence that the plaintiff in this case assigned its rights under the contract of July 1, 1926, to the American Ice Company or its nominee by virtue of the contract of September 24, 1926, between the plaintiff and said Ice Company, and action taken by them in the execution and performance of said contracts, then the court instructs the jury that the plaintiff cannot recover in this action and they must find a verdict for the defendant.

"6. The court instructs the jury that the contract sued on in this case provides that if the defendant has

reason to believe that the credit of the plaintiff was impaired, it should have the right to cancel the contract, and if the jury believe from the evidence that the defendant, through its officers or employees, after the execution of the contract of July 1, 1926, had reason to, and did, believe that the credit of the plaintiff was impaired, and so notified the plaintiff, either on the 18th or 21st day of September, or thereafter, and signified its intention to cancel said contract, and thereafter refused to deliver any further coal to the plaintiff, they should find a verdict for the defendant.

"7. The court instructs the jury that an assignment of the contract for the sale of personal property need not be a formal document and need not be in writing but may be oral. Any language written or oral which shows an intention of transferring or appropriating a chose in action or contract to or for the use of another, if based upon a valuable consideration, will operate as an assignment of the rights of the assignor in respect of or under such chose in action or contract.

"C-1. The court instructs the jury that the contract of July 1, 1926, between New River Coal Company and the J. Maury Dove Company, of Washington, .D. C., was such a contract as could be properly and legally assigned.

"C-2. The court instructs the jury that the contract of September 24, 1926, between J. Maury Dove Company, of Washington, D. C., and the American Ice Company, coupled with the subsequent acts of the parties, would not of itself necessarily constitute an assignment of the contract. In order for there to have been an assignment the jury must believe from the evidence that at some stage by the proceedings there was a meeting of the minds of the assignor and the assignee, or its nominee, at which time it was under-

stood and agreed that the contract should be then assigned notwithstanding the objections of the defendant. No written assignment is essential, but you must believe from the evidence that the assignor and assignee proceeded so far with the execution of the purposes of the contract of September 24th that they themselves considered the contract of July 1st assigned and acted upon such assumption. In that event their executory contract of September 24th, coupled with their acts and conduct, would constitute a complete and valid assignment. Whether such assignment occurred, however, is a matter for the jury to determine from the application of the above principle to the evidence before you.

"C-3. If you find under instruction 2 above that the said contract was assigned by the plaintiff to the American Ice Company or its nominee, the J. Maury Dove Company, of Delaware, then you are instructed that the plaintiff by that act divested itself of its rights under the contract and cannot maintain this suit and you should find for the defendant.

"C-4. If you find under instruction 2 above that the contract was not assigned you will next determine whether the contract was canceled by the defendant in accord with its provisions, and in this connection you are instructed that if you believe from the evidence that the defendant discontinued shipments under the contract because it had received information that caused it to believe, in good faith, that the plaintiff's credit had been further impaired; and that the defendant refused to make further shipments to the plaintiff for the reason, then or thereafter expressed to the plaintiff, that the defendant believed from information received that the plaintiff's credit had been impaired;

then the defendant was within its rights in cancelling the contract.

"On the other hand the defendant could not arbitrarily cancel the contract and should you believe from the evidence that defendant's refusal to ship further coal under the contract was not actuated by the *bona fide* belief that plaintiff's credit had been impaired, then it was not justified in such refusal and you should find for the plaintiff.

"C-5. Should you find for the plaintiff the court tells you that the usual and proper measure of damages is the difference between the contract price of $2.00 per ton during October and $2.70 per ton during November and December, f. o. b. mine, and the wholesale price f. o. b. mines at the time when deliveries should have been made. But the purpose of the law is merely to compensate the innocent party to a breached contract, for the damages actually suffered as a result of the breach. Therefore, should you find that by the agreement of November 17th the plaintiff contracted to sell all the coal purchased under the contract of July 1st to the J. Maury Dove Company, of Delaware at cost, not obligating itself to sell any more coal than should be received from the defendant under said contract of July 1st, then the plaintiff suffered no pecuniary loss by a breach of the contract, and having lost nothing, can recover nothing in this suit other than nominal damages for any shipments due subsequent to November 17th. So that from October 1st to November 17th the measure of damages is the difference between the contract price above mentioned and the market price at the time shipments were due; and subsequent to November 17th only nominal damages can be awarded."

Instructions 1 to 7 were given upon request of coun-

sel, one or more of them being first amended. Instructions C-1 to C-5 were given by the court of its own motion or in lieu of other instructions offered.

*Wm. C. Sullivan* and *Gardner L. Boothe,* for the plaintiff in error.

*Carlin, Carlin & Hall,* for the defendants in error.

CRUMP, P., after making the foregoing statement, delivered the following opinion of the court.

The plaintiff in error, a corporation organized under the laws of the District of Columbia, instituted a proceeding in foreign attachment against the defendant in error, a corporation under the laws of West Virginia, as principal defendant under the attachment statutes of Virginia. The principal defendant appeared personally and thereafter the case proceeded as a common-law action instituted by the petitioner as plaintiff. A trial was had before a jury and a verdict was rendered for the defendant coal company, upon which the court entered judgment; whereupon the plaintiff obtained a writ of error.

The plaintiff in error will be referred to as Dove Company, or plaintiff, and the defendant in error as coal company.

The errors assigned are based upon rulings of the trial court in giving and refusing instructions, in the admission and exclusion of evidence, and in overruling a motion for a new trial.

In its attachment petition the plaintiff alleged, as its cause of action, that the coal company had by written agreement bound itself to ship to the plaintiff from the Slab Fork Mines, in West Virginia, approximately 30,000 tons of coal in varying stated number

of tons each month commencing with the month of July, 1926, and concluding with the month of March, 1927, at a price of $2.00 per ton, f. o. b. mines; and that the coal ordered during the first three months having been shipped, received, and paid for, the defendant refused the plaintiff's requisitions for coal to be shipped during October and subsequent months, whereby the plaintiff had suffered a loss of $22,000.00 by reason of the difference between the contract price and the market price of the coal which the defendant had refused to ship. A copy of the contract for the sale and purchase of the coal was filed with and made part of the petition.

The defendant filed grounds of defense of some length, from which, however, it appears that coal company based its denial of any right of recovery against it upon two defenses, (1) that the contract reserved to it as the seller the right to cancel the contract whenever it had reason to believe that the credit of the buyer, the Maury Dove Company, was impaired; that the credit of the buyer had become impaired and it had so lost its right to require further execution of the contract, and (2) that the Maury Dove Company had undertaken to assign all of its properties and assets, including its right to the coal under the contract, to a third party, with a view to its final liquidation, and that such an assignment could not be made without defendant's consent, which it had refused to give; that the October and November requisitions were for coal to be shipped to such assignee, with whom the defendant declined to deal, and that, therefore, the plaintiff "had lost, abandoned and divested itself of every and all right, interest and claim in or under said contract."

The evidence upon the trial was very voluminous,

covering, with the documentary testimony and proceedings, about two hundred pages of the printed record. It is impracticable here to do more than give such outline of the evidence as may enable this court to consider and pass upon the questions raised.

The coal contract between the parties was dated July 1, 1926, and became effective July 26th, on which date it was approved and accepted by the defendant.

The pertinent provisions of the contract are:

"Cash on or before the fifteenth day of each month for all coal shipped during the preceding month. Failure of the buyer to comply with the terms of payment shall give the seller the right to cancel this contract, but waiver of this right, in any instance, shall not prevent the subsequent exercise of it by the seller. The right is especially reserved by the seller to cancel this contract whenever the seller has reason to believe the credit of the buyer is impaired.

\*          \*          \*          \*          \*

"Shipments made by the seller to the buyer during any one month shall constitute fulfillment of this contract for that month and the tonnage herein contracted shall be cumulative only for such one-month period, except by mutual agreement.

"The price named in this contract is based on the price of coal, f. o. b. the mine, or mines, as of the date of this contract. Should the total cost of production increase or decrease by reason of changes in rates paid to labor at the mines, then the price specified shall be changed accordingly during the period in which the changed labor rates are in effect. This condition means that if there is a reduction in labor costs during the terms of this contract the buyer is to have the benefit of such reduction, and if there is an increase

in labor cost during the term of this contract the buyer is to pay such increase.

"There are no understandings or agreements relative to this contract, or its subject-matter, that are not fully expressed herein, and it is not effective until it is signed by the seller, accepted by the buyer, and approved by an executive officer of the 'New River Coal Company.' "

The Dove Company had been engaged for several years prior to 1926 in the business of buying coal and fuel and selling and delivering it to consumers and others in the District of Columbia, its officers and place of business being in the city of Washington.

In the month of January, 1926, the company was largely indebted and in financial straits, and seems to have been on the verge of insolvency. A meeting of the creditors of the company was held during that month which resulted in the formation and execution of an agreement, on January 20th, to which the Dove Company was party of the first part, five trustees selected from and representing the creditors were parties of the second, and such creditors as signed the agreement parties of the third part. This agreement recited the inability of the company to realize upon its assets so as to meet its obligations promptly, and the purpose of the creditors to grant an extension of time to the end that the company might extricate itself from its financial embarrassment. This instrument is of considerable length. It is stipulated that the creditors shall, for a period of twelve months, take no steps by suit or otherwise for the collection of their debts. The officers of the company are, during that period, to continue the business, under the supervision and control of the trustees, the current claims against the company are to be paid in regular course, and the

general or deferred indebtedness then existing and represented by the trustees was to be liquidated from time to time as surplus cash funds permitted such payments to be made without interfering with the regular course of business. The creditors generally accepted the agreement, among them the New River Coal Company, to whom was then due the sum of nearly $22,000.-00 for coal sold to the Dove Company prior to 1926. On February 26, 1926, Mr. Dove and two of the trustees wrote the coal company: "We enclose herewith financial statement showing the condition of the J. Maury Dove Company, which demonstrates its ability to meet its obligations promptly as they mature. This committee has control of the finances of the J. Maury Dove Company and is in a position to assure you, through its direction of the affairs of the company, that all invoices will be promptly met when due." Other assurances to the same effect were given and the coal company continued to furnish coal from time to time, payment of which was promptly met; and in July the coal contract in issue was entered into.

The coal shipped, under the July contract, during July and August was paid for. It appears from the evidence that during the summer of 1926 several items of large amount, theretofore carried as valid and collectible claims in the assets of the Dove Company, became doubtful or worthless, again causing the company to become embarrassed. A meeting of the creditors and others interested in the company was called for September 18th in Washington. Mr. McCoy, secretary and treasurer of the coal company, attended the meeting. In his testimony he states he spent the 17th in Washington examining into the financial condition and the credit situation of the Dove Company. As to the credit he claims "absolutely it had been

impaired." At the meeting held on the 18th the
affairs of the company were discussed for several
hours, and McCoy testified, Mr. Snead, one of the
trustees, acting as chairman of the trustees and direc-
tors, explained verbally a proposition from the Ameri-
can Ice Company to purchase the physical assets and
properties of the Dove Company, under the terms of
which the deferred creditors would get ninety cents on
the dollar; that the Dove Company would be liqui-
dated forthwith and what surplus there was would go
to the stockholders of the company. Mr. McCoy and
Mr. McIntire, one of the trustees, testified for the
defendant, and Mr. Dove and Mr. Snead, a trustee
for the plaintiff, as to what took place at the meeting,
in considerable detail, differing in regard to various
matters. It resulted that the creditors present assented
to the tentative proposition to liquidate the company
by the sale of its physical assets to the American Ice
Company. McCoy testified that after the meeting he
went with others to the office of Mr. Dove, the presi-
dent, and the consummation of the proposition to sell
out was discussed; that some one remarked that the
American Ice Company would not be buying a going
business, whereupon "Dove promptly said he proposed
to turn over the contract with the New River Coal
Company to the American Ice Company," and he
(McCoy) "promptly and emphatically informed Dove
that when the J. Maury Dove Company signed the
agreement of sale and liquidation with the American
Ice Company, that their credit would be wiped out;
that it would not have a contract with us, and that
the contract would not be assigned or transferred to
the American Ice Company, and the word *transferred*
was used and not *assigned*." In regard to what took
place in the course of this conversation Mr. Dove gave

a different account from that given by Mr. McCoy. Mr. McIntire, who was also present, testified that McCoy made the statement in the presence of himself to Mr. Dove when the latter said that he was going to assign the New River contract, that they would not assign or transfer that contract.

The proposed sale to the American Ice Company was consummated by an agreement executed by the Dove Company and the ice company September 24, 1926. By its terms the Dove Company agreed to "sell and deliver, convey, transfer, assign and set over unto the party of the second part, or its nominee, by good and sufficient contract, bill or bills of sale, and deed or deeds of conveyance, containing correct and full legal description, all its good will, business and assets, except as hereinafter stated," upon which follows a description of the real estate, leases, coal yards in Washington and at Rosslyn, Virginia, trucks, cars, fixtures, tools and other tangible property. Excluded from the agreement are "its cash assets, open accounts or notes receivable," certain stock and certain securities listed in a schedule attached to the instrument. The ice company is given the right to form a new corporation to bear the name of J. Maury Dove Company, Incorporated, or any and all variations of that name which the ice company may desire to use. The Dove Company agrees that it will "upon the consummation of this agreement and the completion of the purchase aforesaid by the party of the second part, retire from all business operations and take all necessary steps to effect a full and complete abandonment and dissolution of its corporate rights, franchises and charter; that it will not, at any time after the completion of the sale and transfer, hereinbefore provided for, be or become engaged in any branch of the busi-

ness of·buying or selling coal, coke, wood, oil, or fuel of any kind, at wholesale or retail, or identified or connected therewith in any manner whatever, financially, actively or otherwise, either directly or indirectly." Mr. Dove is to bind himself not to engage personally in any such business, and to co-operate in the organization of·a new corporation under the laws of Delaware, or some other State, to bear the name of J. Maury Dove Company, Incorporated. It is finally stipulated that upon a failure to perform these covenants and agreements the ice company may recover damages agreed to ·be taken as liquidated in the sum of $100.00 per day. The ice company was to pay a consideration of $200,000.00 in cash and to assume a mortgage on real estate for $40,000.00. On October 1st the provisions of the contract were complied with as far as then practicable, and the $200,000.00 was paid over to a liquidation committee, by whom it was distributed in accordance with the liquidation plans.

The new corporation—the "nominee" of the ice company—procured a charter under the laws of Delaware on September 28th under the style of J. Maury Dove Company, Incorporated, was organized on September 29th, Mr. Dove being made president. Mr. Dove testifies that the former Washington corporation did no business in the sale or purchase of coal and fuel after September 30th.

Mr. Caperton, president of the coal company, testified as to information concerning losses of the Dove Company which gave him reason to believe that the credit of the company had become impaired after July, 1926. He also stated that he met Mr. Dove in Washington on September 21st and in that interview Mr. Dove told him that "he was selling out his physical assets, that is, his plant and equipment; that he retained the

bills receivable or treasury assets, and that he would liquidate the old J. Maury Dove Company as quickly as possible, certainly in three months;" that he, Dove, expected to take employment under the new company, which would be organized as a subsidiary of the American Ice Company. Caperton testifies that during the course of that conversation he said to Dove: "Maury, you have got a contract with us and if you propose to sell out I want you to cancel it—return it." On September 25th the American Ice Company wired to the coal company a five days' notice of its "proposed purchase of the good will, business and principal assets of J. Maury Dove Company, Incorporated." On September 28th Mr. Snead, as chairman of the executive committee of the Dove Company, wrote to the coal company, enclosing a form of assent to the proposed sale to be executed by the coal company, adding: "The sale of the company will be formally consummated on the 30th, and distribution of the funds from the sale will be made immediately thereafter. Ninety-five per cent, in number and amount, of the creditors have agreed to this basis of settlement which was necessary in order to consummate the sale. Please execute and return the agreement immediately upon receipt in order that the committee may have same in hand at their meeting on Friday, October 1st." In reply the coal company, by Caperton as president, wrote to the trustees of the Dove Company that, provided the current account against the Dove Company was paid, the coal company would accept eighty per cent of its deferred claim of $21,992.04, and agree to any disposition seen fit to be made of the excess over eighty per cent. October 2nd the American Ice Company wired the coal company, and on the same day wrote that "we wired you this morning as follows: This com-

pany took over properties of J. Maury Dove Company in Washington as of October 1st. Coal shipped to them from that date is for our account and we assume responsibility for payment. Letter following—which we now confirm. We have taken an assignment of your contract with the Dove Company and trust our relations in the future will be of a most satisfactory character." Under date of October 5th the coal company replied by letter through Caperton in which he states: "I am advised that our contract with the Dove Company cannot be assigned without our consent, all things considered we are unwilling to give such consent or to continue supplying coal under that contract."

Mr. Dove, in his testimony, denied that McCoy had, at the meeting in Washington, made any suggestion that business relations or the contract in suit would be terminated, or that McCoy, at the conference in his office on September 18th, had said that the contract in suit would not be assigned, or that it would be terminated or cancelled upon the deal going through. Mr. Dove and others in his office testified as to a long distance conversation Dove had with Caperton on October 2nd, in which Dove complained that no shipments of coal had been made since September 24th, and explained to Caperton that credit to the Dove Company was equivalent to credit to the American Ice Company; and at the conclusion of the interview Dove immediately telegraphed to Mr. Oler, president of the ice company. In regard to this conversation Mr. Dove also testified as follows:

"Q. Now, I believe you said that in your talk with Mr. Caperton on October 2nd, you gave him references as to the credit of the American Ice Company?

"A. No. I referred to the American Ice Company for the Dove Company's credit.

"Q. What Dove Company's credit?

"A. The J. Maury Dove Company, of Delaware.

"Q. That is what I mean. You referred him then to the American Ice Company for the credit of the J. Maury Dove Company, of Delaware?

"A. Yes, sir.

"Q. You told him in conversation that that company was functioning, did you?

"A. No, he asked me the question. He knew nothing about the new company. I said the best thing I can do is to say that the American Ice Company stands behind it and I will have Mr. Oler furnish you the same information by wire and letter today.

"Q. You did tell him then that there was a new company?

"A. Yes, sir.

"Q. Did you tell him what the style of it was?

"A. That never came up.

"Q. You just told him that a new company had succeeded to the business of the plaintiff and that the American Ice Company would give assurances as to the credit of the new company?

"A. Correct.

"Q. Did you tell him that you were president of the new company or representing the new company?

"A. I don't know whether I did or not. I told him I was authorized to speak for the new company, at any rate.

"Q. And it was, of course, the new company that was short of smokeless coal on that date?

"A. Yes."

Following this telephone talk Mr. Dove went to Charleston, W. Va., and there saw Mr. Caperton on October 5th. Under date of September 29th the J. Maury Dove Company mailed to the coal company

a requisition for seventy-eight cars of coal to be shipped during the month of October, at the rate of three cars a day. At the interview in Charleston, October 5th, Mr. Dove had with him a copy of the agreement of September 24th with the ice company which was shown to Mr. Caperton; he told Caperton that no actual assignment of the coal contract had been made, as the assignment had not been executed; that Oler's telegram was wrong; Caperton, and also his counsel who was present part of the time, read the September 24th agreement and the counsel gave it as his opinion that the agreement itself operated as an assignment; the final result of the conversation was "that Caperton refused to go along." Mr. Caperton was examined and cross-examined at length with reference to this interview. He said Mr. Dove stated that the coal required was to be shipped to the new Maury Dove Company. There are some contradictions in their testimony, but they both agree that Caperton said he had sold the October output of coal to various parties, prior to that interview—probably by October 2nd, Caperton claiming he had a right to do so, as his contract with the old company was at an end; and he had sold the coal at from $2.00 to $2.75 a ton. Dove saw Caperton again on October 14th without result, though he then told Caperton that if it was a question of credit he was prepared to settle for coal shipped, paying cash on invoice or in advance or otherwise. Correspondence ensued during October between counsel for the two companies as to the right of the coal company to refuse shipments of coal either on the ground of impaired credit or assignment of the contract. On November 2nd counsel for the Dove Company sent the following to the coal company:

"Gentlemen:

*Attention Mr. Caperton.*

"Acting as attorney for the J. Maury Dove Company, Incorporated, organized under the laws of the District of Columbia, and pursuant to your contract with that company of July 1, 1926, I beg to enclose duplicate Order No. 389, dated September 29, 1926, together with New York Draft, No. 33,192, in the sum of $7,500.00. Please promptly execute the order mentioned.

"Likewise acting as attorney for the same company, pursuant to the same contract, I beg to hand you herewith further order No. 469 under date of November 2, 1926, together with New York draft No. 33,193 in the sum of $7,500.00, and shall likewise appreciate your prompt attention in executing this order also.

"As you have already been advised through your counsel, Mr. E. W. Knight, no assignment of the contract mentioned was ever made, and my client has waived the credit feature as typified by the remittances herewith made. The two Dove Companies have agreed upon a new contract, which will be executed within the next few days, and a copy of which will be transmitted to you at that time through your counsel, by which the provision of the contract between the Dove Company and the American Ice Company, prohibiting the former from engaging in business, is modified to the extent of requiring that company to continue in business for all of the purposes of your contract with it.

"I am of course forwarding a copy of this letter to Mr. Knight.

"Yours very truly."

To this Mr. Caperton replied on November 4th thus:

"Dear Sir:

"Our reply to your letter of November 2nd has been somewhat delayed by the absence from town of the writer.

"We were repeatedly advised more than a month ago by your clients, the J. Maury Dove Company, with which we had a coal contract, and the American Ice Company, that said coal contract together with the business and all property and assets of the Dove Company, with certain exceptions, had been assigned to the American Ice Company, and that the Dove Company was bound to discontinue business and would be liquidated, etc., and such liquidation was immediately begun. We promptly notified representatives of both companies that we would not consent to the assignment, and that we regarded the coal contract as ended.

"We cannot see that the proposed new contract between the Dove Company, which you mention, purporting to rescind or modify portions of the contract between the Dove Company and the ice company affects the situation, and we are not willing to make a contract for the sale of coal on the terms indicated by your orders.

"Accordingly we return herewith the orders and drafts which accompanied your letter.

"Very truly."

A subsequent requisition for coal was also sent on November 27th, which was likewise refused.

The new contract referred to was executed on November 17th by the old Dove Company of the first part, the American Ice Company of the second part, and the new Delaware Dove Company of the third part, as a modification of the September 24th agreement. It states that the Delaware corporation is the nominee

of the ice company under the September 24th agreement, and the parties mutually covenant that so much of the former agreement as required the old Dove Company to retire from all business operations, to effect a complete abandonment and dissolution of its corporate rights, and to institute proceedings for its dissolution within three months, and as prohibited it from being or becoming engaged in any branch of the business of buying or selling coal and fuel, directly or indirectly, should be modified so as to permit the old company to continue in the business of buying coal of the New River Coal Company under the contract of July 1st, and to so continue until the expiration of that contract on March 31, 1927. In this modified arrangement the old Dove Company binds itself to "promptly, upon the purchase of any and all coal from the New River Coal Company as aforesaid, sell the same to the party of the third part at cost price to it; that it shall and will also continue in business for the purpose of instituting and prosecuting any suit or suits against the New River Coal Company in the event that company shall adhere to its declared purpose of not performing the aforesaid contract;" and the period for the dissolution of the old company is postponed to a period of three months succeeding March 31, 1927. The new Dove Company agrees "that it will promptly upon demand of the party of the first part place it in funds with which to make such payment accompanying order or otherwise to the New River Coal Company for any and all coal which shall be so purchased by the party of the first part from the New River Coal Company in accordance with the aforesaid contract" of July, 1926. In all other respects not modified the September 24th agreement is ratified and confirmed.

[1] It is contended here in oral argument that this new

agreement emphasizes the fact of the incapacity of the former Dove Company to continue its execution of the coal contract after September 24th, and is a further recognition of the absolute transfer of all its contractual rights under that contract to the new company, leaving the old company entirely without credit and in the position of having abandoned the contract on its part. However that might be, all inferences in that connection were for the jury to consider, together with the other evidence in the case.

[2] The court has considered all the evidence in the record and is satisfied that the trial court did not err in submitting the issues arising upon the evidence to the jury, nor in overruling the motion to set aside the verdict.

[3] It was urged upon the court in oral argument here that the stringent obligations imposed upon itself by the Dove Company in the agreement of September 24th contemplated the practical extinguishment of its corporate existence at once, except for purposes of liquidation, and provided for an immediate cessation by it of all business transactions, so that it was in no sense any longer a going concern, and thus exhibited an intention on the part of the company to, in fact, terminate its legal entity for business purposes so that its credit was absolutely impaired and continuance of business by it was excluded; that its officers acquiesced in this view, and considered a transfer or assignment of its assets as accomplished, because in demanding further shipments of coal they confessedly did so only in the name of the new company, and did not undertake to act for the plaintiff company, until after the modified agreement of November 17th; that this latter agreement was in effect a ratification of the assignment to the new company, as that company was to receive the

coal at the exact cost price fixed by the contract, the money merely passing through the old company, in name, as a medium; that the intention of the coal company was plainly manifested prior to October 1st, to cancel the coal contract as a matter of course.

Such arguments, however, were for the jury. It is clearly a case in which the jury should determine whether the defendant had repudiated the coal contract and had just cause for so doing.

We will consider the specific assignments of error in the sequence in which they appear in the petition.

[4] The first error complained of is the ruling of the court in admitting as evidence the arrangement with the creditors on January 20, 1926, and other matters relative to the financial and credit situation of the Dove Company prior to July, 1926. We see no error in this ruling. These were circumstances known to both parties at the time the coal contract was entered into. They threw light upon the meaning and intention of the parties in the contractual reference to the impairment of the buyer's credit, and were relevant for that purpose. They in no wise contradicted or added to or altered any portion of the contract. It was pertinent for the seller to show that he gave credit in reliance upon a continuance of the restored credit of the buyer.

[5] The second assignment is based upon the refusal of the court to permit counsel to put the following question to the witness, Caperton, upon cross-examination, viz: "And did you not know from that language that that only became operative when the completion of the sale was made, so far as your contract was concerned, by the actual assignment of your contract?" The language referred to was a provision in the September 24th agreement, which the witness had

testified he particularly noticed. The answer which the witness would have given to the question is not in the record. But the form in which the question is put would evidently have produced a discussion between counsel and the witness as to the meaning and legal effect of the language in question, and we think the court properly ruled it out.

[6] In the third assignment complaint is made of the ruling of the court in failing to strike out answers by the witness, McIntire, to questions concerning what was said in the conference in Dove's office on September 18th as to what the American Ice Company was buying. The witness, McCoy, had already testified to practically the same thing, and in any event this ruling of the court could scarcely have been prejudicial to the plaintiff.

[7] We do not think the court erred in refusing to admit in evidence the letters between counsel for the parties, mentioned in the fourth assignment. These letters, the first being dated October 14th, were written with the intention of arguing the correctness of one or more of the positions taken by the respective parties and were properly excluded.

Coming now to the law governing the consideration of the case by the jury, we are of opinion that the instructions given by the court, some of which were drawn by the learned trial judge, were clear in statement, sufficiently covered the issues in the case, amply protected the rights of both parties, and were correct in substance.

[8, 9] The plaintiff requested the court to instruct the jury to disregard all evidence pertaining to the financial condition or credit of the plaintiff, which the court refused. It is contended by learned counsel for the Dove Company that the evidence is insufficient to

show any impairment of credit, or that the coal company cancelled the contract for any such reason; and further contended that the coal company had repudiated the contract on another ground and so waived any impairment of credit. We cannot agree with the argument along these lines. In considering such a request, or a motion to set aside the verdict upon such grounds, we should consider the testimony bearing upon the points in question, as upon a demurrer to the evidence. *Morris* v. *Alvis*, 138 Va. 149, 121 S. E. 145. The determination of this case centered around what was done and said in the period from September 17th to October 5th, with the light thrown upon the occurrences in that period by the testimony concerning the subsequent conduct, acts, and statements of the parties in interest.

The credit of the original Dove Company, as a subject involved, lay upon the very surface of the transactions during the period mentioned, would naturally have been in the minds of the parties, and according to the testimony for the defendant was to some extent the subject of discussion provoking a statement that the credit would become further impaired if the sale to the ice company was put through, and that would cause a cancellation of the coal contract. As the plaintiff subsequently sought continued credit for the new company, and not for the contracting party, it was for the jury to determine whether or not the contract was and should be considered as cancelled and abandoned.

[10–15] No formal notice was necessarily required, as under the peculiar circumstances of this case the initiation of all the transactions in question was caused by the plaintiff company. Knowledge may be equivalent to notice. Nor do we think the testimony is sufficient to raise any question of waiver. The right

to take advantage of a stipulation concerning impairment of credit is not similar to that arising upon a breach by the other party of an affirmative condition in a contract of sale. It is a continuing right or contractual privilege inhering at all times in the dealings of the parties. In connection with such a stipulation, there is no breach of a specific term in the contract, which the other party overlooked in a way to mislead the party in default. Under the Virginia decisions no question of waiver could arise here. *Ford Motor Co.* v. *Switzer,* 140 Va. 383, 125 S. E. 209; *Atlantic Coast Line R. R. Co.* v. *Bryan,* 109 Va. 523, 65 S. E. 30; *Security Company* v. *Fields,* 110 Va. 827, 67 S. E. 342; *Richmond Trust Co.* v. *Christian, ante,* page 244, 142 S. E. 528. If the coal company had continued to furnish the coal during October, then the question of waiver might have arisen. The question of impairment of credit, and assignment or requirement by the original contracting buyer that the seller should accept a substituted buyer, are so interwoven in this case that the seller could rely upon both and was not put to an election. In instruction 2 given by the court the general right of recovery was plainly stated. By instructions 3, 6, C-3 and C-4 the court gave the correct law to the jury, by which they were to consider the question of impairment or loss of credit. These instructions are in accord with the instructions approved by the court in *Sun Company* v. *Burruss,* 139 Va. 279, on page 289, 123 S. E. 347, and properly guarded the rights of the plaintiff.

[16–19] In the instructions 5, 7, C-1 and C-2, considered together, the court told the jury that the coal contract could be assigned, if properly and legally done, and correctly defined what were the proper and legal elements of an assignment in the case before them. It

is settled law that as a general rule the obligation arising under a contract may be assigned to a third party, the assignment or transfer may be made to appear by oral statements of the parties, or by their acts and conduct. When the contract contains mutual obligations and liabilities, or involve a relation of personal confidence, it cannot be assigned by one party without the consent of the other. The contract in question here was an executory contract requiring performance on the part of the seller by deliveries made from time to time, with a right during the execution of the contract to cease performance if there was an impairment of this particular buyer's credit, and with other mutual stipulations. It is often difficult to determine when one party to a contract has a right to transfer it to another party, so as to give him a substituted right to demand performance of the contractee. Under the decisions in *McGuire* v. *Brown*, 114 Va. 235, 76 S. E. 295; and *Eastern Corporation* v. *Beazley*, 121 Va. 4, 92 S. E. 824, we are of opinion that the contract in the instant case was not transferable without the assent of the coal company. The duty of accepting the ice company or the new corporation as the buyer and of investigating its credit could not be "thrust upon" the seller, as said in *McGuire* v. *Brown, supra.* See also *Arkansas Valley Smelting Co.* v. *Belden Mining Co.*, 127 U. S. 379, 8 S. Ct. 1308, 32 L. Ed. 246; *Hardy Implement Company* v. *Iron Works*, 129 Mo. 222, 31 S. W. 599; *Paige* v. *Faure*, 229 N. Y. 114, 127 N. E. 898, 10 A. L. R. 649. Instant demand by the new corporation, as the substituted party, for continued performance of the contract *with it* seems to have been made by Mr. Otey for the ice company and continued through Mr. Dove, who had been president of the old company. The effect of this and of the evidence generally was properly left to the jury.

The numerous instructions offered both by the plaintiff and by the defendant in conflict with the principles embodied in the instructions given were properly refused.

Since we are of opinion to affirm the judgment of the trial court entered upon a verdict finding that the plaintiff was not entitled to recover, it is not necessary to notice the interesting questions regarding the proper measure of damages, argued at length by counsel.

We have given the case careful consideration, and we are satisfied that one fair trial has been had upon the merits of the case and, therefore, "substantial justice" has been afforded the litigants—as held in *Northwestern Nat. Insurance Company* v. *Cohen*, 138 Va. 177, 121 S. E. 507.

[20] The court deems it proper to call attention to the following condition of the record in this case. The proceedings and evidence in the trial, appearing in the printed record from page 89 to page 303, were manifestly taken from the stenographer's transcript. It is not in any way identified nor authenticated by the trial judge. Bill of Exceptions No. 11 merely refers to "the following as the evidence," but there is nothing to indicate what is the evidence. Such a reference does not comply with the requirement held requisite in *Turner* v. *Smith*, 143 Va. 206, 129 S. E. 367; *Blackwood Coal Company* v. *James' Adm'r*, 107 Va. 656, 60 S. E. 90, and *Pereira* v. *Moon*, 146 Va. 225, 135 S. E. 672. As no point was made of this by defendant's counsel, and as the court had considered and passed upon the case, and it is possible the original in the trial court may contain a certificate of the trial judge, we have not further examined into this situation.

Upon the whole case we find no error prejudicial to the plaintiff in error, and the judgment is affirmed.

*Affirmed.*