151 Va. 740 (1928)
COLONNA SHIPYARD, INCORPORATED
v.
J. F. DUNN.
Supreme Court of Virginia.
October 30, 1928.
Sinnott, May & Leaman, for the plaintiff in error.
B. A. Banks and Kelsey & Jett, for the defendant in error.
1. ADMIRALTY -- Exclusive Jurisdiction of United States Courts -- Mechanic Repairing a Ship at Dock. -- An injury suffered by a mechanic through the negligence of his master, while repairing a ship at a dock in navigable water of the United States, is a maritime tort and cognizable in admiralty. An action for such injury may be maintained in a State court, but the recovery and relief to be afforded for such injury are to be determined by the rules of admiralty, and not by the common law.
2. ADMIRALTY -- Validity of State Statutes Affecting the General Maritime Law of the United States. -- State legislation modifying, changing, or affecting the general maritime law of the United States, or which works material prejudice to the characteristic features of the general maritime law, or which interferes with the proper harmony or uniformity of that law in its international and interstate relations, is invalid as being repugnant to Article 3, section 2, of the Federal Constitution.
3. ADMIRALTY -- Power of Congress to Fix and Determine Maritime Law. -- Article 3, section 2, of the Constitution of the United States extends the judicial power of the United States to all cases of admiralty and maritime jurisdiction; and Article 1, section 8, confers upon the Congress power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all others vested by the Constitution in the government of the United States. In consequence of these provisions Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country.
4. ADMIRALTY -- State Workmen's Compensation Statutes -- Remedy under Compensation Act not a Common Law Remedy. -- Exclusive jurisdiction of all civil cases of admiralty and maritime jurisdiction is vested in the Federal District Courts, saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it. The remedy which the compensation statute attempts to give is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court and is not saved to suitors from the grant of exclusive admiralty jurisdiction.
5. ADMIRALTY -- State Workmen's Compensation Statutes -- Compensation Statutes Inapplicable where the Injury is Maritime. -- The workmen's compensation statutes of the several States are, under the Federal Constitution, invalid and ineffectual to the extent that they undertake to prescribe the rights, remedies, and liabilities, as between employer and employee, when the employee receives a maritime injury or suffers death through a maritime casualty, while engaged in a maritime employment or the performance of a maritime contract.
6. ADMIRALTY -- Maritime Injuries -- Injury Suffered by Employee on Navigable Waters. -- When an injury is suffered by an employee on navigable waters or on a completed vessel, while engaged in an employment directly affecting navigation or commerce, the injury and employment are maritime and within the exclusive jurisdiction of admiralty.
7. ADMIRALTY -- Maritime Injuries -- Injury Suffered by Employee on Navigable Waters -- Case at Bar. -- In the instant case plaintiff, an acetylene welder, was injured while engaged in working upon the boiler of a ship lying afloat in navigable water at defendant's dock. On account of the darkness in the hold it was necessary to furnish the workmen with extension cords carrying 110 volts of electricity and 110 volt lamps. Plaintiff claimed that his injuries were due to the defective insulation of one of these cords in that he received an electric shock causing him to fall and seriously injure himself.
Held: That the injuries received by the plaintiff were maritime, both with respect to the locality of the alleged tort and the direct relation of his employment to navigation and commerce, that the case fell within the exclusive jurisdiction of admiralty, and that the Virginia workmen's compensation act had no application.
8. MASTER AND SERVANT -- Action for Injury by Servant -- Negligence of Master -- Electricity -- Defective Insulation in Extension Cord -- Case at Bar. -- The instant case was an action by an acetylene welder against his master for injuries received while engaged in working upon the boiler of a ship lying afloat in navigable water at defendant's dock. Plaintiff claimed that his injuries were due to defective insulation in an extension cord furnished by his master to supply light to the workmen engaged on the job. The only evidence tending to show that the cord was in safe condition was given by defendant's electrician, who testified that he inspected all electrical equipment and replaced them when necessary, but did not inspect or examine the cords after they were given out unless complaint was made about them. There was no doubt that the rubber insulation had been worn off the cord in question. It appeared from the evidence that the cord had not been delivered to the plaintiff by the electrician and that plaintiff had never had possession of, or used, this particular cord until the accident happened.
Held: That the jury were justified in finding that defendant did not exercise ordinary care to furnish a safe electrical cord to plaintiff.
9. MASTER AND SERVANT -- Safe Machinery and Appliances -- Safe Place to Work -- Inspection by Master. -- The master personally owes to his servants the duty of using ordinary care and diligence to provide for their use, in his service, sound and safe machinery, instrumentalities, and appliances, and an environment, reasonably calculated to insure their safety; and he is equally bound to inspect and examine all appliances in use from time to time, and to use ordinary care and skill to discover and repair defects in them.
10. MASTER AND SERVANT -- Safe Machinery and Appliances -- Liability of Master. -- If the master know, or would have known, if he had used ordinary care to ascertain the facts, that the machinery, instruments, or appliances, which he has provided for the use of his servants are defective and unsafe, and the servant is thereby injured, the master is liable.
11. NEGLIGENCE -- Ordinary Care -- Dependent upon Circumstances. -- Ordinary care depends upon the circumstances of the particular case, and is such care as a person of ordinary prudence, under all the circumstances, would have exercised.
12. MASTER AND SERVANT -- Electricity -- Defective Insulation in Extension Cord -- Duty of Master to Inspect -- Case at Bar. -- The instant case was an action by plaintiff against his master for injuries received due to a defective extension cord supplied by the master. Even though the cord which caused plaintiff's injury was in a safe condition at the time it was given out by defendant's electrician to the workmen engaged upon the job (which was purely a question of fact for the jury), it would have been no more than reasonable precaution on the defendant's part, while its employees were working on the ship, under the conditions and in the environment then existing, to ascertain whether the cord it had provided for plaintiff's use was in a condition to be handled by him with safety, especially as the plaintiff had never had possession of the cord and had had no opportunity to examine it until the time of the accident.
13. MASTER AND SERVANT -- Safe Machinery and Appliances -- Allowing the Instrumentalities to Fall Below a Certain Standard of Efficiency. -- The master is charged with knowledge that if he allows the instrumentalities of his business to fall below a certain standard of efficiency, the servants who use or are brought into proximity with them in the course of their employment will probably be injured. He does not conduct himself as a prudent man, therefore, if, in carrying on his business, he fails to take due notice of the fact that the machinery and other inanimate appliances, after the lapse of a certain period of time, longer or shorter according to the nature of the material, will certainly deteriorate in quality, as the normal result of wear and tear incident to their use.
14. MASTER AND SERVANT -- Safe Machinery and Appliances -- Duty of Inspection. -- The master's responsibility for the safe condition of the instrumentalities attaches at the first moment when they are put into use, and continues as long as they remain in use. Such being the character of the master's responsibility, the existence of the duty of inspection is a necessary consequence of the fact that the master's obligations cannot be adequately discharged unless, during the entire period of which that responsibility is predicated, he takes notice of whatever a reasonably prudent person would have ascertained under the particular circumstances involved.
15. ELECTRICITY -- Master and Servant -- Negligence Inferred from Improper Insulation. -- Negligence in inferable, where a wire carrying a current of electricity is not properly insulated so that servants who have to handle or work near it may do so without danger.
16. MASTER AND SERVANT -- Safe Machinery and Appliances -- Inspection -- Custom Relieving Master from Inspection. -- The instant case was an action by plaintiff against his master, a shipyard, for injuries due to a defectively insulated extension cord furnished by the master for the job upon which plaintiff was engaged. It was argued that defendant was relieved of the duty of inspection because such was the custom in the shipyard. The evidence to support this claim consisted solely of the statement of defendant's electrician that he never inspected the cords after he gave them out and did not consider it necessary to do so unless complaint was made.
Held: That such a custom would contravene the rule which imposes upon the master the duty of exercising reasonable care to inspect machinery and appliances. Moreover, the custom was specifically controverted by the electrician's further statement that it was his, and not the plaintiff's, duty to inspect.
17. MASTER AND SERVANT -- Safe Machinery and Appliances -- "Simple" or "Common Tool" Doctrine -- Case at Bar. -- The instant case was an action by a servant against his master for injuries received when handling a defectively insulated electric wire supplied by the master to furnish light to the workmen engaged on the job. It was contended that the master owed no duty of inspection because the extension cord in this case came within the operation of the "simple" or "common tool" doctrine.
Held: That the "simple tool" principle had no application because the extension cord was in no sense a tool of any sort. It was merely a necessary accessory to the place of work, thus falling within the rule as to the non-delegable duty of the master to furnish the servant a safe place to work. Moreover, plaintiff never had possession of the cord before the accident and had no opportunity to inspect it.
18. ELECTRICITY -- Master and Servant -- Ordinary Care. -- Electricity is a dangerous agency, and those using it must exercise ordinary care for the protection of their employees from a dangerous current over their wires from any source.
19. MASTER AND SERVANT -- Assumption of Risk -- Employee Injured Through Defective Insulation of Electric Cord -- Case at Bar. -- In the instant case, an action for damages by a servant against his master, the servant was injured throught the defective insulation of an electric cord. The electric cords in use upon the job upon which plaintiff was employed had become wet, and a fellow workman of plaintiff had been warned not to use them. There was no evidence that plaintiff heard this warning. The evidence did not show that plaintiff knew, or had reason to know, that the cord in question was defective. Plaintiff had a right to assume under the circumstances that defendant had taken proper precautions to keep the instrumentality in a reasonably safe condition.
Held: That plaintiff did not assume the risk of injury from handling the cord.
20. MASTER AND SERVANT -- Negligence -- Master Failing to use a Reasonable Decree of Care to Protect Servant -- Assumption of Risk. -- Any failure on the part of the master to observe for the protection of his servant that reasonable degree of care which the circumstances of the particular case demand is actionable negligence, and is not within the influence of the doctrine of assumed risk.
21. MASTER AND SERVANT -- Assumption of Risk -- Danger Due to Negligence of Employer. -- An employee cannot be held to have assumed the risk of a dangerous and unusual condition due to the negligence of his employer or of those for whose conduct the employer is responsible, unless he is aware of such negligent act, defect or disrepair, and of the risk arising therefrom, or unless the defect and danger are so obvious that an ordinarily prudent person under similar circumstances would have observed and appreciated it.
22. MASTER AND SERVANT -- Fellow Servant -- Non-Delegable Duty of Master -- Electrician and Acetylene Welder. -- The instant case was an action by an acetylene welder against his master for injuries received when handling a defectively insulated electric wire furnished by the master for the work upon which plaintiff was engaged. Defendant claimed that plaintiff and its electrician were fellow servants, and that if defendant had on hand a sufficient number of reasonably safe electric extension cords, and the electrician gave plaintiff a defective cord, the negligence would be that of a fellow servant and plaintiff could not recover.
Held: That defendant's duty to furnish reasonably safe instrumentalities was non-delegable and the fellow servant doctrine had no application.
23. MASTER AND SERVANT -- Fellow Servants -- Safe Machinery and Appliances -- Delegation of Duty. -- The duty of the master to use ordinary care to provide and maintain reasonably safe instrumentalities for his servants and like care and skill to discover and repair defects in them, is non-delegable.
24. NEW TRIALS -- Excessive Damages -- Personal Injuries. -- As there is no legal measure of damages in cases involving personal injuries, the verdict of the jury in such cases cannot be set aside as excessive unless it is made to appear that the jury has been actuated by prejudice, partiality or corruption, or that they have been misled by some mistaken view of the merits of the case.
25. NEW TRIALS -- Excessive Damages -- Personal Injuries -- Verdict for $35,000.00 -- Case at Bar. -- In the instant case, an action for injuries by a servant against his master, plaintiff received an extensive fracture of the skull, resulting in a permanent brain injury, partial paralysis, and loss of memory. Plaintiff had to be waited upon as if he were an infant. A physician who had examined him testified that there was no chance of improvement in plaintiff's condition. Plaintiff had lost all earning capacity. Plaintiff had a dependent wife and five small children.
Held: That a verdict for $35,000.00 could not be set aside on the ground that the amount allowed was excessive.
26. NEW TRIALS -- Excessive Verdict -- Where Court if Acting in Place of Jury Would have Given More or a Less Amount. -- The court cannot interfere with the verdict because, if acting in the place of the jury, it would have given more or less than the amount allowed.
27. ACTIONS -- Parties -- Mental Competency to Maintain Suit. -- In the instant case, an action by a servant against his master for damages for injuries received by the servant, it appeared that plaintiff had suffered loss of memory as to events preceding the accident, and was in a helpless physical condition at the time of trial, but there was no evidence to show that he was then incapable of conducting his own affairs.
Held: That it did not appear from this evidence that plaintiff was mentally incompetent to maintain his suit.
28. PARTIES -- Insanity -- How Question of Plaintiff's Mental Competency to Maintain Suit Raised. -- In the instant case defendant contended that plaintiff was not mentally competent to maintain his suit.
Held: That if defendant wished to raise this question, it should have been done by proper plea before the case was tried.
Error to a judgment of the Circuit Court of the city of Norfolk. Judgment for plaintiff. Defendant assigns error. The opinion states the case.
CHINN
CHINN, J., delivered the opinion of the court.
This suit was brought by J. F. Dunn (hereinafter referred to as plaintiff) against Colonna Shipyard, Incorporated (hereinafter referred to as defendant), to recover damages for personal injuries suffered by the plaintiff on the night of September 7, 1926, while employed by the defendant in the work of installing new boiler tubes in the Italian steamship Ludovica, which had been brought to defendant's shipyard for repairs, and was at the time lying afloat at the defendant's dock at Norfolk, Virginia.
Plaintiff was an acetylene welder and had been working during the early part of the night in using an acetylene torch to cut the old tubes out of the boilers in preparation for the installation of the new tubes. At the time he received the injuries complained of he had completed his torch work and was assisting the boiler makers, all of whom were employed by the defendant, in installing the new tubes. Shortly before 12:00 o'clock midnight plaintiff climbed on the staging which had been erected some four feet above the floor of the boiler room, and in front of the starboard boiler boxes, for the purpose of inserting three tubes in the last boiler to be repaired. After pinning two of the tubes, in carrying on his work, plaintiff reached for one of the portable extension lights, furnished by the defendant for the use of its workmen, which was hanging over his head on the door of the boiler box where he was working. It being necessary to have illumination *747 in the boiler room of the steamship to enable the men to do their work, it was furnished by the defendant by means of electricity through portable extension cords about fifty feet in length, attached to a main extension which led from the steamship to an electric terminal on the dock of the defendant; a socket being attached to the free end of the cord in the boiler room in which to insert the light bulb. On the night of the accident the generator set in the shipyard was not being operated, and the electricity for the extensions was supplied by the defendant in the form of what is known as a.c. current, taken from the city's lighting system. When the plaintiff grasped the extension cord with his right hand just below the socket containing the bulb, the light went out, and he was suddenly drawn into a cramped and contracted position and caused to fall backward upon his head to the steel floor of the boiler room -- his hand still gripping the cord -- thereby sustaining serious and permanent injuries.
The trial of the case resulted in a verdict and judgment for the plaintiff in the sum of $35,000.00, and, the defendant having obtained a writ of error, it is now before this court for review.
 It is first contended by the defendant that the trial court was without jurisdiction because the case is governed by the Virginia workmen's compensation act (Acts 1918, chapter 400), which bestows upon the State Industrial Commission exclusive authority to award compensation in all cases coming within the purview of that act. The position is not tenable. While it is true that the facts disclosed by the record are such as would bring the injury complained of within the scope of the act referred to if the case was governed by the State law, it has been definitely settled *748 by the decisions of the Supreme Court of the United States that when an employee suffers injury from a maritime tort, which is within the jurisdiction of admiralty, the workmen's compensation statutes of the several States have no application. This doctrine was in effect recognized in the recent Virginia case of Colonna Shipyard, Inc. Bland, 150 Va. 349, 143 S.E. 729, where Judge Prentis reviews the decisions, and it is held: That an injury suffered by a mechanic through the negligence of his master, while repairing a ship at a dock in navigable water of the United States, is a maritime tort and cognizable in admiralty; that an action for such injury may be sustained in the State court; and that the recovery and relief to be afforded for such injury are to be determined by the rules of admiralty, and not by the common law.
[2, 3] The holding in the above case may well be considered conclusive authority on the subject under consideration, but as it is not claimed in that case, as in this, that the facts bring it within the operation of the workmen's compensation law of this State, brief reference to the decisions in which that question was directly involved and discussed seems appropriate. For that purpose it is sufficient to refer to the leading case of Southern Pacific Company Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A. 1918C, 451, Ann. Cas. 1917E, 900, in which it was held that State legislation modifying, changing, or affecting the general maritime law of the United States, or which works material prejudice to the characteristic features of the general maritime law, or which interferes with the proper harmony or uniformity of that law in its international and interstate relations, is invalid as being repugnant to Article 3, section 2, of the Federal Constitution. As pointed out by Mr. Justice McReynolds in speaking *749 for the court in that case: "Article 3, section 2, of the Constitution extends the judicial power of the United States 'to all cases of admiralty and maritime jurisdiction;' and Article 1, section 8, confers upon the Congress power 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all others vested by this Constitution in the government of the United States or in any department or officer thereof.' Considering our former opinions, it must now be accepted as settled doctrine that in consequence of these provisions Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country. * * * By section 9, judiciary act of 1789, 1 Stat. 76, 77, the District Courts of the United States were given 'exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction; * * * saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it.' And this grant has been continued. Judicial Code, sections 24 and 256 (36 Stat. at Large 1091, 1160, chapter 231; Comp. Stat. 1916, sections 991(1[3]), 1233 [28 U.S.C.A., sections 41(3), 371])."
Accordingly it was held that the workmen's compensation act of the State of New York (Consol. Laws, chapter 67), which, in lieu of the common law liability enforceable by suit in cases of negligence, imposes a liability upon the employer for maritime injuries or death by accident suffered by an employee on navigable waters while engaged in a maritime contract of employment, infringes upon the admiralty jurisdiction of the United States, and is, therefore, invalid to that extent, the court saying:
"If New York can subject foreign ships coming into her ports to such obligations as those imposed by *750 her compensation statute, other States may do likewise. The necessary consequence would be destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish; * * *."
 "Exclusive jurisdiction of all civil cases of admiralty and maritime jurisdiction is vested in the Federal Districts Courts, 'saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it.' The remedy which the compensation statute attempts to give is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court, and is not saved to suitors from the grant of exclusive jurisdictions."
[5, 6] The doctrine established by the Supreme Court of the United States in Southern Pacific Company Jensen, has been steadfastly adhered to by that tribunal in all its subsequent decisions, and as the ultimate and controlling authority on the subject, has also been followed by all other courts both State and Federal. The effect of this doctrine is, as carried into the decisions, that the workmen's compensation statutes of the several States are, under the Federal Constitution, invalid and ineffectual to the extent that they undertake to prescribe the rights, remedies, and liabilities, as between employer and employee, when the employee receives a maritime injury or suffers death through a maritime casualty, while engaged in a maritime employment or the performance of a maritime contract. And it has been uniformly held that when an injury is suffered by an employee on navigable waters, or on a completed vessel, while engaged in an employment directly affecting navigation or commerce, the injury and employment are maritime and within *751 the exclusive jurisdiction of admiralty. Knickerbocker Ice Company Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145; Washington Dawson & Company, 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646; Atlantic Transport Company Imbrovok, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A.(N.S.) 1157; Great Lakes Dredge and Dry Dock Company Kierejewski, 261 U.S. 479, 43 S.Ct. 418, 67 L.Ed. 756; Gonsalves Morse Dry Dock Company, 266 U.S. 171, 45 S.Ct. 39, 69 L.Ed. 228; Robins Dry Dock & Repair Company Dahl, 266 U.S. 449, 45 S.Ct. 157, 69 L.Ed. 372; Messel Foundation Company, 274 U.S. 427, 47 S.Ct. 695, 71 L.Ed. 1135.
 That the injuries received by the plaintiff in the instant case was maritime, both with respect to the locality of the alleged tort and the direct relation of his employment to navigation and commerce, and the case, therefore, falls within the exclusive jurisdiction of admiralty under the provisions of sections 24 and 256 of the Federal Judicial Code is beyond question, 28 U.S.C.A. sections 41, 371. Colonna Shipyard, Inc. Bland, supra, and cases cited. This being the case, in view of the foregoing decisions, the workmen's compensation act has no application, and the plaintiff had the right to seek redress in the Circuit Court of the city of Norfolk without regard to the provisions of said act.
We now come to defendant's second assignment of error, that there is no evidence of actionable negligence.
The declaration alleges in substance that the defendant was negligent: (1) In providing defective and unsafe wires and equipment to furnish light in the boiler room of the steamship for the use of its employees; (2) in failing to properly inspect, provide, and maintain sound and safe electric equipment for that *752 purpose; and (3) in failing to provide a safe place for the plaintiff to work.
The fact that a defect, due to defective insulation, existed in the cord being used by the plaintiff at the time he received his injuries, and that such defect was the proximate cause thereof, is practically conceded. It is contended, however, that "the cord was turned over to the plaintiff in good condition," and the defendant was thereafter under no obligation "of inspection and of taking further precautions to discover defects in the insulation," but that duty rested upon the plaintiff.
In their brief counsel for the defendant make the following pertinent statement:
"We admit that if the insulation had been worn at the time the cord was given to Dunn and shortly thereafter he received a shock, the defendant would be liable. This because it was the duty of the defendant to furnish him with a safe applicance, and, in addition to this, on account of the custom prevailing at the shipyards, Dunn had the right to rely on the master, through its electrician, to furnish him with a safe cord."
The whole question of whether the cord which caused the plaintiff's injuries was in a safe condition when it was furnished the plaintiff for his use, as defendant contends, and whether the defendant afterwards exercised reasonable care, under the circumstances, for plaintiff's safety, was submitted to the jury by the following instructions, which were given at the request of the defendant without objection, and were the only instructions given on the subject:
"The court instructs the jury that if you believe from the evidence the defendant exercised reasonable and ordinary care for the safety of its employees in the *753 selection of the extension cord, and in inspecting it reasonably often and with reasonable care, without finding any defects, then and in that event you should find for the defendant, even though you believe the extension cord was, at the time of the accident, defective."
"The court instructs the jury that a master is not liable for defects in appliances which cannot be discovered by reasonable inspection, and if you believe, from the evidence, the defect complained of could not, by reasonable inspection, have been discovered, then the defendant cannot be held liable."
The only evidence as to the care exercised by the defendant to provide safe extension cords for the men working on the Ludovica on the night of the accident is that furnished by defendant's electrician and witness, E. P. Holland, who had exclusive charge and supervision of all electrical equipment connected with the plant. This witness testified that he made up and tested the extension cords used in the shipyard, and gave them out to the workmen, but did not know to whom those in use on the ship at the time of the accident had been delivered, nor how long they had been in use since they left his custody -- whether one week, two weeks, or a month; that he was the only electrician employed by the defendant; that it was his duty to inspect all electrical equipment and appliances, keep them in repair, and see that they were replaced when necessary; that he did not consider that there was any use of inspecting the electric appliances when there was no complaint about them, and he never made any inspection or examination of the cords after they were given out unless complaint was made about them, regardless of the length of time, or under what conditions they were being used. *754 
Beyond this there is no evidence which tends to show that the cord which brought about plaintiff's injury was in a safe condition when it was given out by Holland, and there is no evidence whatever that it was in such condition when it first came into the plaintiff's possession. On the contrary, the evidence goes to show that none of the extension cords being used on the steamship had been delivered to the plaintiff by Holland, and that he had never had possession of, or used, this particular cord until the accident happened. Holland testifies that when cords were delivered to a workmen, he took the workman's check therefor. He also testified that he could not say whether or not the plaintiff received any cords; nor was plaintiff's receipt produced for this cord or for any cords delivered to him on this job, although the circumstances show that if Holland had delivered one of the cords to him, his check for it must have been in the possession of the defendant at the time of the trial.
The evidence also shows that up to a short time before the accident plaintiff had been engaged on the ship in using an acetylene torch to burn out the old tubes, which itself furnished ample light for that purpose, and he did not, therefore, need an extension cord until he had finished the torch-work and began to assist in installing the new tubes; that immediately prior to the time plaintiff climbed on the platform from which he fell, plaintiff had been working on a boiler on the opposite side of the ship, and when he "moved over" to assist in pinning the tubes in the last boiler to be repaired, he found the cord which produced his injuries hanging in the boiler with the light burning, and apparently in good condition; and that the plaintiff had been working on this boiler only a few minutes, when, in order to change the position of the light, he reached *755 up and caught hold of the cord which produced his injuries.
The evidence further shows that when the plaintiff fell from the staging, one of the workmen who went to his assistance, in attempting to extract the cord from plaintiff's hand, received a shock which threw him back against the bulkhead; that the cord, at the place near the socket when it was in contact with the steel floor of the boiler room emitted sparks; and that upon examination of the cords it was discovered that the rubber insulation had been worn off so as to leave the electric current exposed for a space of two or three inches just below the socket, where the plaintiff had grasped it. J. C. Looney and J. W. Smith, who were placed on the stand by the plaintiff in the capacity of expert and experienced electricians, testified to the effect that if one of plaintiff's hands came in contact with a bare wire in the cord the voltage the wires was carrying was sufficient to convey a shock of more or less severity, and if, at the same time his other hand happended to touch any iron about the ship, the electric current would have passed through his body and so contract his muscles as to cause him to fall from the platform; and that the circumstances of the accident demonstrated that such was the case.
 Considering all the facts and circumstances, including those surrounding the accident, we think the jury were justified in finding that the defendant did not exercise ordinary care to furnish the plaintiff with a sound and safe electric cord for his use, but failed to perform its positive duty in that respect, and their verdict upon the questions submitted to them by the defendant's instructions is, therefore, conclusive.
 It is a fundamental principle of the law of master and servant that the master personally owes to his servants *756 the duty of using ordinary care and diligence to provide for their use, in his service, sound and safe machinery, instrumentalities, and appliances, and an environment, reasonably calculated to insure their safety; and he is equally bound to inspect and examine all appliances in use from time to time, and to use ordinary care and skill to discover and repair defects in them.
 "If, therefore, the master knows, or would have known, if he had used ordinary care to ascertain the facts, that the machinery, instruments, or appliances, which he has provided for the use of his servants are defective and unsafe, and the servant is thereby injured, the master is liable. This doctrine has been so frequently asserted by the courts that it cannot now be considered open to question." Norfolk and Western Railway Company Ampey, 93 Va. 108, 25 S.E. 226; Swift & Company Hatton, 124 Va. 426, 97 S.E. 788.
 "Ordinary care depends upon the circumstances of the particular case, and is such care as a person of ordinary prudence, under all the circumstances, would have exercised." Bertha Zinc Co. Martin, 93 Va. 791, 22 S.E. 869, 70 L.R.A. 999.
 Even though the cord which caused plaintiff's injury was in a safe condition at the time it was given out by Holland (which was purely a question of fact for the jury), it would have been no more than reasonable precaution on the defendant's part, while its employees were working on the ship, under the conditions and environment then existing, to ascertain whether the cord it had provided for plaintiff's use was in a condition to be handled by him with safety. The defendant knew that the insulation on the cords was liable to become defective from ordinary wear and tear; that the cords on the ship were being used both day *757 and night; that there was water and dampness in the boiler room; that the men were working inside of iron boilers; and that if the cords were not properly insulated, more or less injury would be likely to result to those handling them. On the other hand, the plaintiff, according to the evidence, had never had possession of the cord, had had no opportunity to examine it, and had the right to assume that it was safe for him to use it.
 "The master is charged with knowledge that, if he allows the instrumentalities of his business to fall below a certain standard of efficiency, the servants who use or are brought into proximity with them in the course of their employment will probably be injured. He does not conduct himself as a prudent man, therefore, if, in carrying on his business, he fails to take due notice of the fact that the machinery and other inanimate appliances, after the lapse of a certain period of time, longer or shorter according to the nature of the material, will certainly deteriorate in quality, as the normal result of wear and tear incident to their use. * * *." 3 Labatt on Master and Servant (2nd ed.), section 1040. And in section 1056 of the same work, the distinguished author says this:
[14, 15] "Except in so far as his obligations may be modified by common employment, the master's responsibility for the safe condition of the instrumentalities attaches at the first moment when they are put into use, and continues as long as they remain in use. Such being the character of the master's responsibility, the existence of the duty of inspection is a necessary consequence of the fact that the master's obligations cannot be adequately discharged unless, during the entire period of which that responsibility is predicated, he takes notice of whatever a reasonably prudent person *758 would have ascertained under the particular circumstances involved." And so he says: "Negligence is inferable, where a wire carrying a current of electricity is not properly insulated so that servants who have to handle or work near it may do so without danger." Idem, section 1002, and cases cited in note.
Defendant's contention that it was under no obligation to inspect the extension cord which injured the plaintiff is necessarily predicated upon the assumption that the defendant had performed its primary duty to provide him with one that was free from defects. In fact it is freely admitted that unless the cord was actually a safe one when it came into plaintiff's custody the defendant is liable; and in that case the question of whether the defendant owed the duty of subsequent inspection and maintenance does not arise. We have hereinbefore expressed the opinion that the jury would have been justified in finding, under the evidence, that the defendant failed to use due care to provide the plaintiff with a safe extension cord for his use on the ship. Since, however, defendant earnestly insists that the defendant was relieved of the duty of inspection under the circumstances of the case, and that question was also submitted to the jury, it seems proper that this phase of the case should be considered.
 It is argued that the defendant was relieved of the duty of inspection because such was the custom in the shipyard. The evidence relied on to support the claim that a custom existed consists solely of Holland's statement that he never inspected the cords after he gave them out and did not consider it necessary to do so unless complaint was made. As said in American Locomotive Co. Chalkley, 113 Va. 485, 75 S.E. 90: "The tendency of such a custom, if allowed to prevail, would contravene the rule of law which imposes upon *759 the master the duty of exercising reasonable care to inspect machinery and appliances." In addition, the claim that there was such a custom is specifically controverted by Holland's further statement that it was his, and not the plaintiff's, duty to inspect and keep in repair all electrical equipment and appliances.
The cases of Pocahontas Col. Co. Hairston, 117 Va. 118, 83 S.E. 1041; Farmer's Adm'x C. & O. Ry. Co., 144 Va. 65, 131 S.E. 334, and Newport News Pub. Co. Beaumeister, 104 Va. 744, 52 S.E. 627, 7 Ann.Cas. 625, are cited and relied on by the defendant. A cursory examination of them will disclose that the doctrine of those cases is in no sense applicable to the facts of the instant case, and we, therefore, deem it unnecessary to discuss them.
 It is further contended that the defendant owed no duty of inspection because the extension cord in this case comes within the operation of the "simple" or "common tool" doctrine, which exempts the master from obligation to inspect, during their use, those common tools and appliances with which everyone is familiar, upon the ground that the employee who has the tool in his possession is as well qualified, and has a better opportunity, to detect defects and judge of the danger of using it. Southern Railway Company Burford, 120 Va. 157, 90 S.E. 616; C. & O. Ry. Co. Sparrow, 98 Va. 630, 37 S.E. 302; Southern Railway Company Snow, 117 Va. 627, 85 S.E. 488; Colonna Shipyard, Inc. Bland, 150 Va. 349, 143 S.E. 729; 18 R.C.L. page 563. And it is stated in the brief: "Although it (the cord) concealed a wire, deadly in its effects if not properly insulated, yet the insulation itself was a simple thing, easily discernable by anyone, and more particularly by the man who was using it." *760 
We cannot agree with this contention. In the first place the extension cord, as used in this case, was not such an appliance or tool as the doctrine contemplates. In fact it was in no sense a tool of any sort. It was only used to furnish artificial light to enable the plaintiff to see how to do his work, and not as an instrument for its performance. It was really, therefore, merely a necessary accessory to the place of work, and the duty of the defendant with respect to it may be deemed analogous to the master's nondelegable duty to furnish the plaintiff a safe place in which to work, and to come within the influence of that doctrine. In the second place, the evidence shows, or at the least strongly tends to show, that the plaintiff had never had possession of the cord before the accident occurred, had no opportunity to inspect it, and was not aware of the defect in the insulation. For that reason alone the "simple tool" principle has no application.
While it is true that electric drop cords in various forms are in common use, and instances may be conceived of in which, under the test of comparative knowledge, there would be no obligation on the employer to inspect them for defects after they had been placed in the custody of the employee, we know of no case in which such an instrumentality was held to be a "simple tool," or in which the employer was exonerated from the duty of inspection under circumstances such as here exist.
We have, however, through the diligence of counsel, been referred to several cases in which the identical or a similar question has been involved. In the case of Spinney O. V. Hooker & Son, 92 Vt. 146, 102 Atl. 53, the facts and circumstances bear a striking similarity to those in the case at bar. There the employee met his death while lining the inside of an iron cupola *761 with moist clay. In order to do this it was necessary to have the inside of the cupola lighted in some way, so that the defendant furnished an electric light for that purpose which was attached to an ordinary extension cord, plugged into a socket in the room above, and when in use was let down into and hung against the side of the cupola. The light was turned off and on by a hard rubber key and was in all respects like the lamp in common use. On the day of the accident Spinney got his feet and clothing wet on his way to work. He was found dead, and it was afterwards discovered that the insulation was gone from the wires entering the socket of the lamp for a distance of one-fourth of an inch. It was shown that the wires must have been grounded at the time of the accident, but if the wires had been properly insulated the accident would not have occurred. The court said:
"In view of the character of the agency employed and the gravity of the consequences likely to result from inattention and neglect, it was the duty of the defendant to exercise constant and active vigilance of a searching character to keep this apparatus safe. It was for the jury to say whether such inspection as this duty required would have discovered this defect in the cord."
In the case of Aga Harback, 140 Iowa, 606, 117 N.W. 669, where the plaintiff was required to transfer an electric light bulb from one socket to another when occasion arose for using the light in one or the other place, and received an electric shock on account of defective insulation in the wires connecting the lights which seriously injured him, it was held that although the lighting apparatus may have been installed by a competent contractor, the duty rested on the defendant to keep it in repair, and he was negligent if he allowed it to become defective or dangerous. *762 
In Voyer Dispatch Printing Company, 62 Minn. 393, 64 N.W. 1138, where the plaintiff's injury was caused by defective insulation on wires connected with an electric hand lamp, used to furnish light in the pit under a printing press, while plaintiff was undertaking to move the light, the court said:
"It sufficiently appears from the evidence that this pit is a place where defendant's employees are accustomed to go and handle this lamp and wires as plaintiff had handled them, and we are of the opinion that the evidence tends to prove that the defendant was negligent in permitting the insulation of the wire to become defective and out of repair."
In Houston Durham Traction Company, 155 N.C. 4, 71 S.E. 21, three drop cords with incandescent lights were furnished the workmen by the defendant in order that they might move the lights from place to place in a basement where they were working. The floor of the basement was damp all over and in some places water was standing on it. The incandescent globes were screwed in a brass socket. In the light causing the injury one of the screws holding the cap on the socket was missing, and the cap was raised so that the wiring inside the socket was pulled up exposed and touching the side of the brass cap. The voltage was supposed to be 110, but, in handling the light, one of the workmen, owing to excess voltage, received a shock so severe as to cause his death. In affirming a verdict in favor of the plaintiff, the court held that it was the duty of the defendant "to exercise the greatest degree of care and constant vigilance in inspecting and maintaining the wires in perfect condition."
For other cases in point, see Memphis Con. G. & E. Co. Letson (C.C.A.), 135 Fed. 969; Snyder Wagner Elec. Manufacturing Company, 284 Mo. 285, 223 S.W. *763 911; Bice Wheeling Elec. Company, 62 W.Va. 685, 59 S.E. 626; Mitchell U.S. Coal Company, 67 W.Va. 480, 68 S.E. 366. And in A.C.L.R.R. Co. Newton, 118 Va. 222, 87 S.E. 618, where a telephone operator was injured, while using the telephone in the discharge of his duties during a thunder storm, by reason of defendant's failure to keep the lightning arresters in proper condition and affording a sufficient connection with the ground, Judge Keith, speaking for the court, said:
 "The employer was in no sense an insurer of the employee's safety, but it owed him the duty of exercising reasonable care to afford him a reasonably safe place to work, and to install and preserve in a reasonably safe condition the instrumentalities which he was called upon to use in the performance of the duties assigned to him. * * * Electricity is a dangerous agency, and those using it must exercise ordinary care for the protection of their employees from a dangerous current over their wires from any source."
 It is next contended that the plaintiff assumed the risk of his injury. The basis of this argument is that, on account of the weather and other conditions, the electric cords in use on the Ludovica had become wet, and the men warned not to use them. The evidence on this subject is to the effect that there was considerable dampness in the boiler room of the ship, and when the cords absorb a sufficient amount of water they sometime "bite" or "shock" the workmen handling them. It appears that several hours prior to the accident one of the workmen, Nixon, was having this experience in attempting to unscrew the light globe from the end of one of the cords. At that time Hinckleman, defendant's master boiler-maker, came down into *764 the boiler room and seeing the trouble Nixon was having with the light, according to his testimony, said: "That thing is all wet and don't bother none of those. If you doubt any one of those is charged, don't touch it. Go and get candles." Hinckleman then left for the night. It appears that candles were brought down into the boiler room by some one, but as to when, or by whom, the evidence is so uncertain and conflicting as to leave the matter in doubt. It is testified by one witness that plaintiff got the candles, and by another witness that he got them himself.
There is no evidence to show that the plaintiff heard what Hinckleman said to Nixon. On the contrary, all the workmen who were in the boiler room, excepting the plaintiff and one other, testified that they did not hear it. On account of his injuries the plaintiff was unable to testify. It is furthermore affirmatively shown by the evidence that all the workmen continued to use the electric cords about their work without any trouble from them until the accident occurred; that when the plaintiff, in the performance of his duties, "moved over" to the immediate place of the accident, he found the cord which produced his injuries hanging in the boiler box over his head with the light burning; and that the glare from the light prevented him from seeing the defect in the cord. We find nothing in these circumstances to indicate that the plaintiff knew, or had reason to know, that the cord was defective, or that there was any danger attached to its customary use. On the other hand, plaintiff had a right to assume under the circumstances that the defendant had taken proper precautions to keep the instrumentality in a reasonably safe condition, and to rely upon the performance of the defendant's positive duty in that respect. 18 R.C.L. pages 587, 644. *765 
 It is well settled that "'any failure on the part of the master to observe for the protection of his servant that reasonable degree of care which the circumstances of the particular case demand is actionable negligence, and is not within the influence of the doctrine of assumed risk.'" See also Darby Coal Min. Co. v. Shoop, 116 Va. 848, 83 S.E. 412; Black v. Va. Portland Cement Co., 104 Va. 450, 51 S.E. 831; Norton Coal Co. Murphy, 108 Va. 528, 62 S.E. 268.
 An employee cannot be held to have assumed the risk of a dangerous and unusual condition due to the negligence of his employer or of those for whose conduct the employer is responsible, unless he is aware of such negligent act, defect or disrepair, and of the risk arising therefrom, or unless the defect and danger are so obvious that an ordinarily prudent person under similar circumstances would have observed and appreciated it. Chesapeake and Ohio Railway Co. Meadows, 119 Va. 33, 89 S.E. 244; Norfolk and Western Railway Co. Whitehurst, 125 Va. 260, 99 S.E. 568; Harness Baltimore, &c. R. Co., 86 W.Va. 284, 103 S.E. 866.
 The next assignment of error relates to the refusal of the court to give defendant's instruction No. 6, which, in effect, told the jury that the plaintiff and Holland, defendant's electrician, were fellow servants, and if the jury believed that the defendant had on hand, at the time they were taken out and at the time of the accident, more than a sufficient number of reasonably safe electric extension cords, and notwithstanding this fact Holland gave the plaintiff a defective cord, then and in that event the negligence would be that of a fellow servant and the plaintiff could not recover.
This assignment is without merit. *766 
 The duty of the master to use ordinary care to provide and maintain reasonably safe instrumentalities for his servants and like care and skill to discover and repair defects in them, is nondelegable.
"This is one of the personal duties which the master has impliedly contracted to perform towards his servant, and the law will not allow him to escape liability for an injury resulting from the failure to perform it by entrusting the performance of the duty to another. He cannot divest himself of the duty by delegating it to any subordinate officer or servant." Norfolk and Western Railway Co. Ampey, 92 Va. 108, 25 S.E. 226, and cases cited; Norfolk and W.R. Co. Phillips, 100 Va. 362, 41 S.E. 726; Richmond Granite Co. Bailey, 92 Va. 554, 24 S.E. 232; Moon Richmond, &c. R. Co., 78 Va. 745, 49 Am.Rep. 401; Swift and Company Hatton, 124 Va. 426, 97 S.E. 788.
 The defendant insists that the verdict should have been set aside on the ground that the amount allowed is excessive and indicates bias and prejudice on the part of the jury. This subject has been so frequently and fuly discussed in various decisions of the appellate court of this State there seems little need for a repetition of the doctrine already announced in relation to it. The settled rule is that as there is no legal measure of damages in cases involving personal injuries the verdict of the jury in such cases cannot be set aside as excessive unless it is made to appear that the jury has been actuated by prejudice, partiality or corruption, or that they have been misled by some mistaken view of the merits of the case. Burks' Pleading and Practice (2nd ed.), 537; Southern Railway Company Smith, 95 Va. 187, 28 S.E. 173; Chesapeake and Ohio Railway Co. Harris, 103 Va. 635, 49 S.E. 997; Norfolk and Western Railway Co. Shott, 92 Va. *767 34, 22 S.E. 811; Chesapeake and Ohio Railway Company Swartz, 115 Va. 723, 80 S.E. 568; Morris and Company Alvis, 138 Va. 149, 121 S.E. 145; Southern Railway Company Smith, 107 Va. 553, 59 S.E. 372; E. I. DuPont Company Taylor, 124 Va. 750, 98 S.E. 866; Farris Norfolk and Western Railway Company, 141 Va. 622, 126 S.E. 673; Chesapeake and Ohio Railway Company Carnahan, 118 Va. 46, 86 S.E. 863.
[25, 26] Without going into the details of the medical and other testimony as to the extent of the plaintiff's injuries and sufferings, it may be said that, according to the undisputed evidence, he received an extensive fracture of the skull, which caused him to remain in a state of unconsciousness nearly two months, and resulted in a permanent brain injury, partial paralysis, and loss of memory; and has to be waited upon and cared for as if he were an infant. At the time of the trial his condition had shown no change for the better for some time, and a physician of high standing, who had examined him and was well informed as to his case, expressed the opinion that he had then reached the maximum degree of improvement. The evidence also shows that plaintiff had lost all earning capacity and is now entirely dependent. It is argued that the verdict is excessive because six per cent interest on $35,000.00 would amount to more than the $2,080.00 per year which plaintiff earned before he was injured, and at the same time leave the principal unimpaired. We are unable to see the force of this argument. While the jury could not properly, perhaps, take into consideration any probable increase in plaintiff's earning capacity when there was no evidence as to future prospects of promotion or increased earnings, this argument leaves out of view plaintiff's reasonable expectation *768 of life, and pain and suffering that he must have necessarily undergone, and must in the future undergo, on account of his physical infirmities, his helpless condition, and hopeless future with a dependent wife and five small children, for which the law does not afford any rule by which compensation may be measured. We realize that the damages awarded are unusually large, but the character and effect of plaintiff's injuries are also out of the ordinary; and finding nothing in the record to indicate the jury was swayed by any undue motive, or was misled by a mistaken view of the merits of the case, and the verdict having been approved by the learned judge of the lower court, who saw and heard all that occurred at the trial, we feel that under the circumstances this court would violate the settled rules of law on the subject by setting aside the verdict on the ground that the amount allowed is excessive. The court cannot interfere with the verdict because, if acting in the place of the jury, it would have given more or less than the amount allowed. Norfolk and Western Railway Company Shott, supra.
It was said by Judge McLemore in Farris Norfolk and Western Railway Co., 141 Va. 622, 126 S.E. 673: "The 'average verdict' rule cannot be invoked where the injuries are internal, and have produced a condition of greatly impaired earning capacity, continuous pain and suffering, and a dislocated kidney which may or may not produce serious results."
In Chesapeake and Ohio Railway Company Swartz, supra, a verdict of $17,000.00 for the loss of plaintiff's leg, and consequential sufferings, was affirmed. And in Chesapeake and Ohio Railway Company Carnahan, 118 Va. 46, 86 S.E. 863, the court refused to set aside as excessive a verdict of $25,000.00 for the loss of a leg to a plaintiff who was earning $100.00 per month. *769 
[27, 28] Defendant finally makes the contention that plaintiff was not mentally competent to maintain this suit, and it should have been brought by his next friend. While it appears from the evidence that the plaintiff has suffered loss of memory as to events preceding his accident, and is now in a helpless physical condition, there is no evidence to show he is now mentally incapable of conducting his own affairs. If the defendant wished to raise this question it should have been done by proper plea before the case was tried. Houseman Home Insurance Company, 78 W.Va. 203, 88 S.E. 1048.
After careful consideration of all the questions involved in the case, for the reasons hereinbefore stated, we are of the opinion that the judgment of the lower court should be affirmed. The jury was fairly and properly instructed, and the learned judge of the trial court refused to disturb the verdict. The record discloses no grounds to warrant us in doing otherwise.
Judgment affirmed.
CHRISTIAN
CHRISTIAN, J., dissenting:
The condition of Dunn, the defendant in error, and his family appeals most strongly to the heart of any man. But the court nor jury have any right to take $35,000.00 from the pockets of the stockholders of the Shipyard, unless it has been guilty of some breach of duty which was the proximate cause of his injury. We cannot do charity with other peoples funds.
This case was tried and decided upon the rule of evidence familiarly known as res ipsa loquitur. It is not necessary here to state this rule as modified by recent decisions. Dunn was working upon the boiler in the hold of the ship Ludovica. On account of the darkness *770 in the hold, it was necessary to furnish the workmen with extension cords -- fifty to one hundred feet long -- carrying 110 volts of electricity and one hundred and ten (110) volt lamps, so that the workmen could see to do their work.
The wires in these cords are insulated, because they have to be moved from place to place by the workmen, and while 110 volts of electricity is not dangerous, on account of the sweating in the hold of the ship the shock is greater than it would be if it were dry. This shocking is known among the workmen as "biting." These cords and lamps are thoroughly tested before being given to the men. When given to the man they are instructed when from constant handling the cord for any cause becomes defective and bites, to return same to the electrician and get a new one. It was further a rule of the shipyard that if the hold was so wet that the biting became unusual, that the workman should not use these cords but candles. This condition existed in the hold of Ludovica on the night he was injured and was known to Dunn, as he had secured candles with which to work, saying the cords were biting. The fact that no lamp was given Dunn is not negligence, because his line of employment did not require it, and it does not appear that the master assigned him the task in which he was engaged when injured.
All the proof of the injury was that Dunn was working on a wooden scaffold, putting tubes in the boiler. The light in the socket of the extension cord was hanging over his head to the right. He needed the light at another place so he grasped the wire or socket, was drawn by the current and fell from the scaffold to the iron floor of the boiler room on which his head struck, and from the force of the contact he was so injured as to be a helpless paralytic. *771 
What duty did the Shipyard owe to him that was not performed? The only negligence or failure of duty claimed was that it did not inspect the cord which caused his injury. It is a fact known to every one that 110 volts of electricity is used in every house and factory in the country. That millions of extension cords carrying 110 volts are used in the houses of the people and in industry. That while such voltage will shock a person handling it, no serious damage will be done thereby, provided there is no additional, independent force concurring with it to produce the injury. It is suggested by the evidence of the experts that Dunn at the time of his injury must have put his hand upon the iron boiler to make the circuit and caused his injury.
The use of 110 volts of electricity is in such universal and general use, and experience has demonstrated that it is not dangerous, for there is not a case on record where it alone has been the cause of injury. So that the law does not impose upon the owner of the home or industry nor the electric companies the duty to inspect the wires carrying that voltage. In our homes we have extension cords and electric irons carrying that voltage which are daily used. We are not required to inspect same to prevent injury, because it is common knowledge that it will not injure a person. Suppose one of us had an extension cord carrying 110 volts in our bath room not properly insulated, and an invited guest went into the bath room to take a bath, and put his hand on the bath tub and cord at the same time and was injured. No court would hold you liable for damages. Or should the maid place one hand on the improperly insulated electric iron and the other upon some nearby iron object connected with the ground. The law would not impute to you negligence. *772 The master is not required to anticipate in this day of electricity that persons will make a contact that will make dangerous that which without it is not so. In the instant case Dunn was charged with the duty of inspection, knew the cords were biting, and caused his own injury by taking hold of the iron boiler.
The doctrine of res ipsa loquitur is peculiarly applicable to electricity but it never imposes upon the master the duty of inspection, except where the wires or apparatus carry a high voltage which is inherently dangerous. Even in the cases where the rule is applied, it only raises a presumption of negligence, which casts upon the master the burden of proving the exercise of ordinary care, and does not relieve the plaintiff of the burden of proving negligence.
This case stands before us upon a motion to set aside the verdict of the jury because contrary to the law and the evidence. We will have to consider it as if it were here upon a demurrer to the evidence. So considering it, what evidence is there in the case of negligence? We can't presume negligence. Mistakes of law by counsel nor errors of judgment in asking or assenting to instructions cannot work an estoppel, and dispense with the proof of negligence by the plaintiff. The case must be decided according to the law and the evidence.